Appeal of **SAENGER AMUSEMENT**          Docket No. 150.
     **COMPANY, INC.**

> The value of theater leases, good will connected therewith, and film contracts acquired for stock should, for invested capital purposes under the provisions of the Revenue Act of 1918, be determined in the light of facts and circumstances existing at the time of the acquisition thereof. Subsequent earnings alone which are not shown to have been reasonably anticipated or based upon past experience or known existing facts are not sufficient evidence to establish a valuation of such assets.
>
> Invested capital of a corporation can not be increased by the issuance of stock to stockholders in proportion to their stock ownership on account of the determination that film contracts entered into with producers had a value in excess of the amounts required to be paid for the use of the films under the terms of the contract. *La Belle Iron Works* v. *U. S.*, 256 U. S. 377.

Submitted October 18, 1924; decided November 28, 1924.

*Elkin Moses, C. P. A.*, for the taxpayer.

*A. H. Fast, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

This appeal involves excess-profits taxes for 1918 and 1919 and arises from the disallowance in invested capital of the value claimed by the taxpayer of certain theater leases, good will connected therewith, and film contracts acquired for stock, and also from the disallowance in invested capital of the amount of stock issued, based upon the writing up of the value of film contracts acquired from outside interests in the ordinary course of business.

### FINDINGS OF FACT.

The Saenger Amusement Co., Inc., was a corporation organized August 14, 1913, with a capital stock of $100,000, par value. At the time of its organization it acquired five leases on theaters, viz: The Saenger Theater, the Palace Theater, the Queen Theater, the Lyceum Theater, and the Princess Theater.

The corporation was the successor of a partnership doing business under the name of Saenger Bros. The partnership was composed of John Saenger and Ad Saenger. The stockholders of the corporation and the percentages of their stock holdings were as follows: John Saenger, 40 per cent; Ad Saenger, 40 per cent; L. M. Ash, 10 per cent; E. V. Richards, 10 per cent.

No property, either tangible or intangible, was turned in by Ash or Richards for the stock issued to them. Stock was issued to John Saenger and Ad Saenger, the members of the partnership, in exchange for leases on the above-mentioned theaters, equipment therein, and good will connected therewith and film contracts.

The partnership was the owner of the Saenger Theater, with the equipment therein, which it leased to the corporation direct at the time of its organization. The partnership had secured leases on the other theaters and the equipment therein and had secured certain film contracts, all of which it assigned to the corporation when it was organized at an aggregate valuation, including the lease of the Saenger Theater, of $100,000.

The Saenger lease, which was entered into by the corporation and Saenger Bros., was valued at $42,000. The rental required to be paid was $400 per month for a period of 10 years.

No question is presented with respect to the valuation of any of the equipment for which stock was issued in connection with any of the theater leases. The invested capital claimed by the taxpayer in respect to such property was conceded by the Commissioner to be correct and no disallowance in respect thereto has been made.

The lease on the Palace Theater was acquired from a competitor by the partnership of Saenger Bros., in May, 1913, at a monthly rental of $125. It was turned over to the corporation on its organization on August 14, 1913, at a value of $2,600. Within a short time after its acquisition the theater was closed. The principal reason for acquiring this lease was to lessen competition and thus increase the income of the other theaters.

The lease on the Queen Theater was acquired from outside interests by the partnership of Saenger Bros. on April 1, 1913, at a monthly rental of $325, and was turned over to the taxpayer corporation on August 14, 1913, at a value of approximately $9,500. The property covered by this lease was a store building in Shreveport, La. The corporation after acquiring the lease converted the building into a theater. Subsequently the owner of the building converted it back into business property from which he could get more rental than could be secured from leasing it as a theater.

The lease on the Lyceum Theater was acquired from outside interests by Saenger Bros. on July 6, 1913, and was assigned to the corporation August 14, 1913, at a value of $10,000, which, however, included a certain amount of fixtures, which amount is not set out in the record of this case. A lump sum was paid by Saenger Bros. for the lease and equipment. Only the value attributable to the lease was disallowed in invested capital by the Commissioner, the amount attributable to fixtures being allowed.

The lease on the Princess Theater was acquired by Saenger Bros., the partnership, on July 14, 1913, for a period of three years at a monthly rental of $135. It was turned over to the corporation for stock on August 14, 1913, at a value of $4,700.

In addition to the leases above set forth the Saenger Amusement Co., Inc., issued stock at the time of its organization in the amount of $10,473.51 for film contracts which were at that time transferred to it by Saenger Bros. In 1915 the taxpayer issued an additional amount of $50,000 par value stock to its stockholders in proportion to their stock ownership, which represented the value of film contracts entered into with producers in 1915 as then determined by the corporation in excess of the consideration required to be paid for the use of films. The contracts were with the leading producers of that period and gave the taxpayer the exclusive right to use the pictures in its theaters in the territory in which it was operating. After acquiring the said film contracts it was considered by the stockholders that they had a value of $50,000 in excess of the price required to be paid for the use of the films. No stock was issued in payment for or in exchange for such film contracts, but the increased value subsequently determined was written up on the books and capitalized.

The Commissioner disallowed in invested capital for 1918 and 1919 the value of the above-mentioned leases set up and claimed by the taxpayer, upon the ground that no value had been established. The alleged value of the film contracts acquired for stock was disallowed in invested capital upon the ground that it was not proven that they had a value in excess of the consideration required to be paid for the use of such films. The $50,000 par value of stock issued to the stockholders on account of the writing up on the books in 1915 of the value of firm contracts acquired in that year was also disallowed in invested capital.

Large earnings were made by the taxpayer subsequent to the acquisition of the above-mentioned film contracts and theater leases. There were, however, no facts nor circumstances existing on or prior to August 14, 1913, from which such earnings could have been foretold or which could be used as a basis for valuing such contracts and leases in a greater amount than their value when acquired by the partnership.

#### DECISION.

The deficiency determined by the Commissioner is approved.

#### OPINION.

TRAMMELL: The question presented in this appeal, except in so far as it relates to the inclusion of the $50,000 par value of stock issued in 1915 on account of film contracts, is entirely one of fact. It is whether the film contracts and theater leases had an actual cash value. If so, such value should be included in invested capital. The burden is upon the taxpayer to prove the value, if any, of the said leases and film contracts.

The taxpayer relies upon the earnings of the corporation and the success which it attained in subsequent years to establish the value of the leases, film contracts, and other intangibles, if any, which were turned over to it for stock when it was organized.

While subsequent earnings are not to be disregarded in determining values of leases and contracts, it must be kept in mind that it is only the value of assets shown to exist at the time stock was issued therefor which can be included in invested capital. The determination of values of assets paid in for stock must be made in the light of all available evidence existing at the date of the acquisition. Subsequent earnings may be used only to corroborate or substantiate a valuation based on the reasonable expectation of future earnings. A valuation, however, based upon the expectation of future earnings must be determined in the light of known facts existing at that time or upon past experience. A hope of future earnings not based upon some known facts or circumstances, or a mere guess by the owners as to the future earning capacity, however accurate it may be proven to be by subsequent events, does not prove value. Future earnings alone are not proof without reference to the facts from which they could have been reasonably anticipated. All facts and circumstances must be taken and considered together.

In this case the two Saengers secured leases on all the theaters mentioned in the findings of fact (except the Saenger Theater, which they owned) from outside interests. They dealt with them

at arm's length. The leases and contracts were acquired by willing purchasers from willing sellers, and no facts are shown which would warrant the conclusion that the sellers did not demand and receive all they were worth.

The Palace Theater lease was acquired by Saenger Bros. in May, 1912, without the payment of a bonus. The theater was closed within a short time after it was acquired by the corporation on August 14, 1913, the exact date not appearing in the record. It is contended that this lease had a peculiar value to the taxpayer and that the closing of the theater made the others more valuable by increasing the patronage thereof. But, if true, this would not be material. The only material inquiry with respect to this theater is whether the lease at the time it was acquired by the corporation for stock had an actual cash value. It is only the cash value, and not some peculiar value attributable to property by virtue of the use to which it is put, or the peculiar need of the taxpayer, which the statute provides shall be included in invested capital. Whether it at some subsequent time benefited one or more other theaters or increased the value of other theaters is not material if it did not have a cash value at the time acquired by the corporation.

No facts or circumstances are shown to have existed on August 14, 1913, when this lease was turned in to the corporation for stock, which did not exist in May, 1912, when it was acquired for $125 monthly rental, which would indicate that it had a greater value at the later than at the earlier date.

Shorter periods of time elapsed between the acquisition by Saenger Bros. of the leases on the Queen, Lyceum, and Princess Theaters and the time they were turned over to the corporation. The Queen Theater lease was turned over to the corporation by Saenger Bros., approximately four months after they acquired it from outside parties, on a monthly rental basis without the payment of a bonus or further consideration. The Lyceum Theater lease was turned over to the corporation approximately one month after it was acquired by Saenger Bros. The Princess Theater lease was turned over to the corporation one month after it was acquired by Saenger Bros. The record contains no evidence of any facts or circumstances which would warrant placing a different value upon the above leases on August 14, 1913, when they were turned over to the corporation, from the value which they had at the time they were acquired by the partnership.

As to the lease on the Saenger Theater the record discloses no facts upon which the valuation of $42,000, or any valuation, could be based. It is not shown that it could have been rented to outside interests for an amount in excess of the rental required of this corporation. The experience of Saenger Bros. up to the date of the lease to this corporation, or the facts which existed on the date of the lease, did not indicate that this lease had any value.

In respect to the valuation of the film contracts, the witness gave a history of the development of the motion-picture theater business and the improvement of the films. It appears, however, from the testimony that the great advance and development of that industry did not occur or begin until subsequent to the acquisition of the film contracts by the taxpayer. It is contended by the taxpayer that the fact that it had the film contracts, which it acquired from Saen-

ger Bros., enabled it subsequently to acquire other and better contracts. There is no evidence, however, that at the time acquired for stock, such contracts would at any time in the future have been of value in that respect. The record discloses no facts or circumstances existing on August 14, 1913, upon which the taxpayer, or its stockholders or directors, could have based a determination of the value of said contracts. No facts were presented which would indicate a reasonable basis for the anticipation of such future developments and future earnings.

As to the $50,000 par value of stock issued in 1915 to the stockholders in proportion to their stock ownership on account of the writing up on the books of the corporation the value of film contracts entered into with producers, the statute does not provide for the inclusion thereof in invested capital. This is not a case of the acquisition of assets for stock. The film contracts were entered into in the course of business between parties dealing at arm's length. Neither stock nor anything of value was given therefor, except the consideration required for the use of the films. The corporation had already acquired the contracts before the determination was made by the taxpayer that they had any value over the price of the films. The issuance of the stock to stockholders when it was not issued for assets turned in to the corporation is immaterial. It has no effect whatever on invested capital. Only what the statute provides may be included in invested capital. There is no provision for including assets at a higher value than they had when acquired for stock, or at a value in excess of the investment by the corporation when they are acquired for other than stock from persons dealing at arm's length. A bargain can not be capitalized. In its last analysis invested capital is what was embarked in the enterprise and subjected to the risks thereof. The film contracts entered into in 1915 did not represent any investment of the corporation. The invested capital can not be increased by the writing up of the value of such contracts after they were entered into. This, in substance, is what the taxpayer is claiming.

The facts and circumstances relating to the above item bring it within the purview of the case of the *La Belle Iron Works* v. *United States*, 256 U. S. 377, where the United States Supreme Court used the following language:

It is clear that clauses (1) and (2) refer to actual contributions of cash or tangible property at its cash value contributed in exchange for stock or shares specifically issued for it; and that neither of these clauses nor clause (3) which relates to surplus, can be construed as including within the definition of invested capital any marking up of the valuation of assets upon the books to correspond with the increase in market value, or any paper transaction by which new shares are issued in exchange for old ones in the same corporation, but which is not in substance and effect a new acquisition of capital property by the company.

It is clear enough that Congress adopted the basis of "invested capital" measured according to actual contributions made for stock or shares and actual accessions in the way of surplus, valuing them according to actual and bona fide transactions and by valuations obtaining at the time of the acquisition * * *.

Having reached the conclusion, as a matter of law that the subsequently determined value of the film contracts can not be included in invested capital, it becomes unnecessary to discuss the evidence relating to the valuation of such contracts.

For the reasons above stated, it is the opinion of the Board that the taxpayer is not entitled to include in its invested capital for the years in question any amount based upon attributing any value to theater leases or film contracts acquired for stock or any amount on account of the writing up of the value of the film contracts acquired in 1915 and the issuance of stock to stockholders in proportion to their stock ownings on account thereof.