Appeal of GAMON METER CO.                    Docket No. 395.

> Upon the evidence *held:* (1) That patents paid in for stock on December 12, 1910, had a value at that time for invested capital, and on March 1, 1913, for exhaustion; (2) That under section 1331 of the Revenue Act of 1921 the two corporations were not affiliated in 1917 but, under section 240 of the Revenue Act of 1918, were affiliated during the years 1918, 1919, and 1920.

Submitted January 24, 1925; decided May 8, 1925.

*Harvey D. Jacob, Esq.,* for the taxpayer.
*Percy S. Crewe, Esq.,* for the Commissioner.

Before GRAUPNER, LANSDON, LITTLETON, and SMITH.

This is an appeal from a determination by the Commissioner of deficiencies in income and profits taxes for the calendar years 1919 and 1920 in the total sum of $24,769.45, against which are offset overassessments of $1,418.86 for 1917 and $2,515.93 for 1918, resulting in a net deficiency in tax for those years of $20,835.16.

Three questions are presented in this appeal, as follows:

(1) The value at which certain patents paid in on December 12, 1910, for $200,000, par value of the stock, may be included in invested capital.

(2) The value on March 1, 1913, of the patents so paid in for the purpose of exhaustion.

(3) Whether the Gamon Meter Company and the Specialty Products Company were affiliated during the years 1917 to 1920, inclusive.

FINDINGS OF FACT.

1. The Gamon Meter Company, a corporation, was organized November 22, 1910, under the laws of the State of New Jersey, for the purpose of manufacturing a type of water meter at Newark, N. J.

The organization was effected by M. D. Perkins, R. A. Anderson, and Ernest E. Gamon, who, since 1898, had worked together in the same business in another company of which Perkins had been president, Gamon, superintendent, and Anderson, foreman. Becoming dissatisfied with that concern, they had severed their connection with it and sold their interest therein.

Gamon was an experienced water-works and meter engineer, and Perkins and Anderson were men experienced in the water-meter business.

Early in 1910, Ernest E. Gamon started a business for himself, there being issued to him during the year 1910, and prior to November 22, nine patents relating to water meters, the chief attributes of which were accuracy, lower initial cost, simplicity of construction, facility of repair, and lower up-keep cost.

In November, 1910, the three individuals named decided to form their own company. This was done and the business incorporated under the name of the Gamon Meter Company. On December 12, 1910, the following resolution was adopted:

In conformity with the resolution of the stockholders the officers were authorized and are hereby directed to purchase and acquire the business now conducted by Ernest E. Gamon for $200,000 in stock of this company, $1,500 in preferred stock and $198,500 in common stock and to take over and assume all his patent, trademarks, patents pending, and applied for, as well as all his assets and liabilities including a $5,000 mortgage on the property on South Street, Newark.

As the said business and properties have been inventoried and appraised by the Board of Directors in the full sum of $200,000, the above mentioned stock is to be issued for property purchased.

The board of directors of the Gamon Meter Company, by which the assets and patents were valued at the time of the purchase by that corporation, consisted of Gamon, Perkins, and Price, for many years connected with the Neptune Water Meter Company; Brand, a manufacturer of patterns; and Fisher, a patent attorney.

Immediately upon the purchase of the assets, the balance sheet of the corporation showed:

| | | | |
|---|---|---|---|
| Cash | $499.25 | Accounts payable | $5,213.80 |
| Accounts receivable | 6,111.44 | Bills payable | 10,219.00 |
| Inventory | 5,774.89 | Mortgages payable | 5,000.00 |
| Real estate | 8,350.00 | Preferred stock | 58,000.00 |
| Plant & Fixtures | 56,384.22 | Common stock | 200,000.00 |
| Patents | 201,313.00 | | |
| | 278,432.80 | | 278,432.80 |

The patent valuation mentioned was continued in subsequent balance sheets until January 1, 1918, when the same was reduced to $190,000, with the following subsequent changes through deductions for exhaustion in later balance sheets:

| | |
|---|---|
| Jan. 1, 1919 | $178,142.30 |
| Jan. 1, 1920 | 166,284.60 |
| Jan. 1, 1921 | 152,847.97 |
| Jan. 1, 1922 | 139,708.83 |
| Jan. 1, 1923 | 101,273.60 |

One hundred and ninety-eight thousand five hundred dollars par value of common stock, and $1,500 par value of preferred stock, were issued to Gamon for all of his assets, including the patents; $10,000 par value of the common stock was turned back to the company in 1911, leaving a total of issued common stock of the company of $188,500 par value, which continued as representing all common stock issued throughout the history of the company. Fifty-eight thousand dollars of preferred stock was sold for cash. All subsequent increases in capital were in the form of preferred stock, the same amounting, by January 1, 1918, to $190,000, which was sold for cash at par and thereafter continued in the same amount. Both common and preferred stock had equal voting rights. The preferred stock was 7 per cent cumulative and preferred as to assets. No dividends were paid on the preferred stock until July, 1917.

By stipulation it was agreed that expert testimony as to the value of the patents purchased by the taxpayer from Gamon could be produced by the taxpayer as follows:

(a) A prominent engineer, who has built, designed and patented numerous machines and improvements, and who, for the past fifteen years, has been practicing as mechanical expert and patent attorney, and who has given testimony as a mechanical and economic expert in patent suits on patents in various

arts, including water meters, will testify that, in his opinion, the inventions and devices covered by the patents purchased by the Gamon Meter Company were, in November, 1910, worth at a fair cash valuation the sum of $200,000.

(*b*) A prominent patent attorney for the past twenty-four years, who has designed, constructed and superintended the construction of large quantities of machinery of various kinds comprehending structures from small delicate mechanism, such as electrical measuring and recording instruments, to machinery of very large powers, such as hoisting engines, air compressors, automatic compressors, etc., and who has given testimony as mechanical expert in numerous patent suits, will testify that, in November, 1910, the several inventions and patents involved had a fair cash value of $200,000.

(*c*) A prominent patent attorney for the past twenty-one years, who has had wide experience in patents of the character involved, will testify that the inventions and patents purchased by the Company were, in November, 1910, fairly worth the sum of $200,000.

The financial progress of the Gamon Meter Company is reflected in its books, as follows:

|      | Surplus Jan. 1. | Dividends paid. | Meter sales. | Other sales. |
|------|----------------|-----------------|--------------|--------------|
| 1911 | None. | None. | $50,838.47 | |
| 1912 | $248.10 | None. | 131,982.89 | |
| 1913 | 440.35 | None. | 122,496.51 | |
| 1914 | 1,070.53 | None. | 106,735.07 | |
| 1915 | 3,442.76 | None. | 143,244.56 | |
| 1916 | 17,546.93 | None. | 256,824.45 | $248,315.56 |
| 1917 | 75,873.43 | $11,960.03 | 548,064.40 | 33,800.00 |
| 1918 | 93,196.23 | 16,779.58 | 521,796.92 | 62,220.68 |
| 1919 | 109,627.27 | 18,693.50 | 441,691.95 | 62,432.34 |
| 1920 | 140,297.33 | 18,690.60 | 517,870.77 | |
| 1921 | 144,816.94 | 18,378.50 | 440,850.36 | |
| 1922 | 180,271.49 | 23,457.00 | 662,684.75 | |
| 1923 | 237,998.81 | | | |

No patent depreciation was entered upon the books prior to 1917; patent depreciation thereafter taken (together with an inter-company loss of $22,300.10 of 1919, with reference to the Specialty Products Company) would otherwise increase the surplus accounts by the following amounts:

```
1917 _____ $11,580.90
1918 _____  11,857.70
1919 _____  34,157.80
1920 _____  13,436.63
1921 _____  13,445.64
1922 _____  38,455.23

        Total _____ 122,933.90
Add. book surplus _____ 237,998.81

        Total surplus _____ 360,932.71
```

The annual book profits from all sources before patent depreciation and inter-company loss, and other comparative items, were:

| | Profits. | Preferred Stock Jan. 1. | Preferred dividends accumulating. | Total dividends Paid. |
|---|---|---|---|---|
| 1911 | $248.10 | $58,000.00 | $4,060.00 | None. |
| 1912 | 192.25 | 122,500.00 | 8,575.00 | None. |
| 1913 | 630.18 | 139,600.00 | 9,772.00 | None. |
| 1914 | 2,372.23 | 147,600.00 | 10,332.00 | None. |
| 1915 | 14,104.17 | 149,600.00 | 10,472.00 | None. |
| 1916 | 58,326.50 | 155,500.00 | 10,885.00 | None. |
| 1917 | 40,863.73 | 156,600.00 | 10,962.00 | $11,960.03 |
| 1918 | 45,068.32 | 190,000.00 | 13,300.00 | 16,779.58 |
| 1919 | 83,521.36 | 190,000.00 | 13,300.00 | 18,693.50 |
| 1920 | 36,646.84 | 190,000.00 | 13,300.00 | 18,690.60 |
| 1921 | 67,278.69 | 190,000.00 | 13,300.00 | 19,378.50 |
| 1922 | 119,639.55 | 190,000.00 | 13,300.00 | 23,457.00 |
| Totals | 468,891.92 | ---------- | 131,558.00 | 107,959.21 |

Purchasers of water meters usually require a test period of from six months to two years as proof of accuracy and durability of a new or different type of meter before giving consideration to its installation.

2. Prior to July, 1917, the Gamon Meter Company had in its possession machinery, some of which had been acquired for war contracts, and, desiring to keep this part of its plant in operation, began the manufacture of snap fasteners for ladies' dresses, operating this line in its own building. Up to that time it had expended some $30,000. Finding that it was not producing in sufficient quantity to compete in the snap-fastener market, it negotiated with one Huguley, a competitor owning a small plant, who had perfected an automatic machine for the manufacture of snap fasteners. These negotiations resulted in the purchase of Huguley's plant and assets for the sum of $3,350, which was paid to him in cash by the Gamon Meter Company, that company at the same time employing him at a salary of $50 per week to manage its snap-fastener business. Huguley had no financial interest in the Gamon Meter Company and was employed at the time of the purchase of his plant solely with the view that he would make the snap-fastener business of the company a success. Subsequent to these transactions it was decided to form a separate corporation to engage in the snap-fastener business, in order to keep all accounts with reference thereto off the books of the Gamon Meter Company. For business reasons it was also deemed desirable not to have it appear that the Gamon Meter Company was the owner of the new corporation. On August 17, 1917, the Specialty Products Company was organized with a capital stock of $50,000, represented by 500 shares. In order that it might appear that the stock was issued for value, in accordance with the laws of the State of incorporation, the following resolutions were adopted and appear in the Directors' Minute Book of the Specialty Products Company:

Upon motion duly made and seconded, it was resolved that 370 shares of stock, amounting to $37,000 par value be issued to Merritt D. Perkins, as consideration for the sale to this company of the assets of the Automat Tool Works of Brooklyn, N. Y., which said price of $37,000 was hereby fixed and determined as a fair price in the judgment of said Board of Directors of said company, and the same is necessary for the business of the company.

On motion made and duly seconded, it was resolved that 100 shares of common stock of the company amounting to $10,000 be issued to William C. Huguley as consideration for the sale to this company of certain tools and machinery, the schedule of which had been made and submitted to this Board.

Upon motion duly made and seconded, it was resolved that 30 shares of the common stock of this company, amounting to $3,000 be issued to George H. Gleeson, as consideration for the cancelling by the said George H. Gleeson of the agreement for the sale of the products of the said Automat Tool Works, which said agreement affecting the Product and machinery is hereby cancelled and made void between the parties.

The only money invested in the Specialty Products Company was that advanced by the Gamon Meter Company, no consideration whatever being paid by Huguley for the 100 shares issued in his name. The remaining 400 shares were issued in the names of persons who were officers of the Gamon Meter Company. The certificates were endorsed and remained in the stock certificate book in the custody of the treasurer of the Gamon Meter Company. The Commissioner admits that the 400 shares were the property of the Gamon Meter Company. The 100 shares issued to Huguley were not endorsed but were retained by him until later sold in 1920, with the consent of the Gamon Meter Company, to an individual on friendly terms with the officers of that company, who also agreed that the Gamon Meter Company should control the stock. The 100 shares were subsequently, in 1923, acquired by the Gamon Meter Company. This stock was given to Huguley as an incentive for him to work for the success of the snap-fastener business, his employment being on a fixed salary with the expectation of participating in any profits by way of dividends to the extent that his ability was reflected in the earnings of the business.

It was agreed between Huguley and the Gamon Meter Company at the time of the issuance of the stock to him that he would always vote his stock as directed by the Gamon Meter Company; also that he would not dispose of the stock without the consent of the Gamon Meter Company, such agreement being faithfully carried out by him. The same understanding and actuality existed as to the friendly purchase of the stock from Huguley.

All of the directors and officers of the Gamon Meter Company were directors and officers of the Specialty Products Company, Huguley being an additional director and vice president of the latter. Meetings of the respective boards of directors were held at the same time and place.

During the several years subsequent to organization of the Specialty Products Company, the Gamon Meter Company advanced some $100,000 toward the development and operation of the snap-fastener business conducted by the Specialty Products Company, no funds being obtained by the latter other than those from the Gamon Meter Company.

After some years' experience the Gamon Meter Company caused the Specialty Products Company to be dissolved.

The actual management of the operations of the Specialty Products Company was controlled by R. A. Anderson, who was also superintendent of the Gamon Meter Company, having charge of all the operations of the Gamon Meter Company, including that of the Specialty Products Company.

Under date of December 20, 1919, the Gamon Meter Company caused to be organized another corporation, known as the Victory Hammered Piston Ring Company, to handle a separate line of its business, namely, the manufacture of piston rings. In order en-

tirely to take off the books of the Gamon Meter Company the account of the Specialty Products Company, then amounting to $82,300.10, that account was sold to the Victory Company for $60,000, under the following resolution:

Resolved that this company accepts the offer of the Gamon Meter Company for the sale of the interest of the Gamon Meter Company in the Specialty Products Company, a corporation of this state, including all claims of and demands of the said Gamon Meter Company against the said Specialty Products Company for the sum of $60,000.

While the Victory Company had been operated merely as a name from February, 1919, to December, 1919, advances to it by the Gamon Meter Company totaled $46,399.68, so that, at the incorporation, capital stock was issued to the Gamon Meter Company in the amount of $100,000, reducing the liability to $6,399.68. The 1,000 shares were issued—900 shares to the Gamon Meter Company and the balance in equal amounts to four individuals who were officers and directors of the Gamon Meter Company and who endorsed the certificates in blank and turned them over to the Gamon Meter Company, which company, therefore, from the date of incorporation, owned all of the stock of the Victory Hammered Piston Ring Company.

### DECISION.

The deficiency should be recomputed in accordance with the following opinion. Final determination will be settled on consent or on seven days' notice, in accordance with Rule 50.

### OPINION.

LITTLETON: Section 207 (a) (2) of the Revenue Act of 1917 provides that the term "invested capital" shall mean:

* * * The actual cash value of tangible property paid in other than cash, for stock or shares in such corporation * * * at the time of such payment * * *: *Provided*, That (a) the actual cash value of patents * * *. paid in for stock or shares in such corporation * * * at the time of such payment, shall be included as invested capital, but not to exceed the par value of such stock or shares at the time of such payment. * * *

Section 326 of the Revenue Act of 1918 provides as follows:

(a) That as used in this title the term "invested capital" for any year means * * *

(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest; * * * *Provided*, That in no case shall the total amount included under Paragraphs (4) and (5) exceed in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding at the beginning of the taxable year; * * *

Under the provisions of the 1917 Act, patents paid in for stock are not affected by the 20 per cent limitation on intangibles, as provided in subsection (b) of the proviso, but the value at which patents may be included in invested capital is limited to the par value of the stock issued therefor. Under the provisions of the 1918 Act the value at which the patents may be included is limited, in this

case, to 25 per cent of $346,000, the par value of the stock outstanding on March 3, 1917, or the actual cash value of the patents at the time paid in, whichever may be the lower.

The value of these patents for invested capital and depreciation purposes is sought to be established: First, upon an appraisal by the directors—these being men of many years' experience in the water-meter business and acquainted with patent values; secondly, by expert testimony; thirdly, the purchase for cash within the first year of the organization of the company by persons familiar with the business of $122,500 of stock preferred as to assets in the event of dissolution; fourthly, the superiority of the meter under the Gamon patent through or by reason of accuracy in measurement, low initial cost, simplicity of construction, facility of repair and lower up-keep cost. The Commissioner for the first time, in the brief filed, objects to the expert testimony contained in the stipulation on the ground that this testimony is not based upon the proper foundation and is unfortified by any data. It was stipulated that the expert testimony could be produced in this case as set forth in the findings of fact. Such evidence is competent and admissible. Its weight is for the Board to determine.

The Gamon Meter Company was incorporated November 22, 1910, for the purpose of manufacturing water meters under nine basic patents, issued during that year to Ernest E. Gamon, who, for many years, had been engaged in the water-meter business. On December 12, 1910, the company purchased the business of Gamon, including the patents issued and applied for, the same being inventoried and appraised at $200,000; the consideration paid therefor being $198,500 in common stock ($10,000 of which was later returned to the company) and $1,500 in preferred stock. The incorporators and directors of taxpayer were experienced water-meter engineers and constructors. From experience they knew that a new type of water meter could not be successfully manufactured and marketed without the necessity of several years being spent in advertising and demonstrating. They knew also that, under usual and ordinary circumstances in that business, no net profit would accrue from the manufacture and sale of water meters for five or six years after the organization of the company. The men who subsequently became connected with the Gamon Company were men also familiar with the water-meter business.

At the time of organization of the company, persons closely associated with Gamon purchased for cash $58,000 of the preferred stock of the company, and during 1911 twenty-six persons familiar with the water-meter business purchased preferred stock of the company at par, in amounts ranging from $500 to $25,000, a total of $122,500; the purchaser of $25,000 of this stock at par being M. D. Perkins, who, since 1898, had been president of a company engaged in the manufacture and sale of water meters. The preferred stock was 7 per cent cumulative with equal voting rights, being preferred as to assets in case of liquidation, the principal asset of the Gamon Meter Company being the patents.

The evidence shows that the men who became interested in the Gamon meter recognized a decided improvement in the water meter under his patent; furthermore, that this patent had an inherent and substantial value in the beginning destined ultimately, in their

opinion, greatly to enrich the original investors. The officers of the corporation, as well as the purchasers of the stock of the Gamon Meter Company, at about the time of and soon after its organization, were familiar with the water meters then in use and manufactured by some eight corporations throughout the United States. They also knew that the greatest earnings from the sale of water meters would naturally come from municipalities. They knew further that it necessarily required from one to two years' test period to convince municipalities of the merits of a meter before changing from a water meter already in use. Three prominent engineers and patent attorneys of more than twenty years' experience in the water-meter business, and of wide experience in connection with patents, considered the patents acquired by the corporation from Ernest E. Gamon to be of a cash value in November, 1910, of $200,000.

It appears from the record that this company manufactured articles other than water meters. It had Government contracts during 1916. In that year sales of articles other than water meters were about equal to their water-meter business. The profits in that year alone were over three times the combined profits of the five preceding years during which sales had consisted exclusively of water meters. The company also engaged in the snap-fastener business and in the manufacture of piston rings, prior to the time that it formed a separate organization to conduct those activities. We can not definitely determine from the record the extent to which the patents were instrumental in producing the financial success of the company for several years subsequent to the time they were paid in, or to what extent the activities in other lines, some of which obviously caused losses, reduced or increased the annual profits. We do observe, however, that the total cumulative dividends on the preferred stock were not paid in full during the twelve years for which figures have been presented. With a life of but five years more for the patents, it would appear that if they had an actual cash value of $200,000 in 1910, the value would have been demonstrated to a greater extent during 12/17ths of the life of the patents; at least to the extent of the payment of all cumulative preferred stock dividends by that time.

It appears from the evidence that the valuation of $200,000 for the patents at the time paid in was predicated to a considerable extent upon future hopes and not altogether upon what the patents were actually worth in cash at that time. The experience of the men interested in the patents perhaps justified their belief that they would ultimately prove successful and result in large earnings, but the Revenue Act contemplates a cash value at the time the patents are paid in. Congress recognized the difficulty of proving with absolute accuracy the actual cash value of intangibles, when it provided in the Revenue Act of 1918 three bases for the inclusion of intangibles in invested capital. No hard and fast rule can be laid down for determining the value of intangibles for invested capital and depreciation purposes. Value is a question of fact. Evidence which would establish a value in one instance might not under peculiar circumstances surrounding an asset of the same nature support any value whatever. It is the duty of the Board to determine in each case such value as is warranted by the evidence.

Under the facts in this appeal, it is the opinion of the Board that the patents involved had an actual cash value on December 12, 1910,

for invested capital, of $75,000, and on March 1, 1923, for exhaustion, of that amount less exhaustion at the rate of 1/17th per annum from 1910.

Section 1331 of the Revenue Act of 1921, defines affiliation under the Act of 1917 as follows:

(b) For the purpose of this section a corporation or partnership was affiliated with one or more corporations or partnerships (1) when such corporation or partnership owned directly or controlled through closely affiliated interests * * * all or substantially all the stock of the other or others, or (2) when substantially all the stock of two or more corporations * * * was owned by the same interests: *Provided,* That such corporations or partnerships were engaged in the same or a closely related business, or one corporation or partnership bought from or sold to another corporation or partnership products or services at prices above or below the current market, thus effecting an artificial distribution of profits, or one corporation or partnership in any way so arranged its financial relationships with another corporation or partnership as to assign to it a disproportionate share of net income or invested capital. * * *

Upon the evidence before the Board, the Gamon Meter Company, hereinafter called the Gamon Company, and the Specialty Products Company, hereinafter called the Specialty Company, were not affiliated during 1917, within the meaning of the section above quoted. The business of manufacturing snap fasteners for ladies' dresses is not the same nor a closely related business to that of manufacturing water meters. There were no inter-company transactions such as the Act defines. The separate organization of the Specialty Company, on the contrary, was for the very purpose of keeping the snap-fastener business off the books of the Gamon Company, giving thereby, in the operation of the joint enterprises, no appearance of any connection between the Specialty Company and the Gamon Company. There were no sales between the two companies effecting an artificial distribution of profits, nor was any method resorted to so as to assign to one a disproportionate share of the net income or invested capital. Affiliation for 1917 depends upon whether the facts bring the case within the terms of the proviso. Since the facts in this appeal clearly show that these two companies do not fall within the proviso of section 1331, they can not be held to have been affiliated.

The provision of section 240 of the Revenue Act of 1918, relating to affiliation, provides:

* * * (b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests. * * *

Under this section affiliation for 1918 and subsequent years may result, although there were no inter-company transactions, commingling of accounts, or other elements set forth in the proviso applicable to the 1917 law. This appeal, therefore, if one for consolidated returns, must come within subdivision (1) of clause (b). That subdivision imposes three tests relative to stock ownership or control, any one of which permits consolidation—

(1) Ownership of substantially all;
(2) Control of substantially all through closely affiliated interests;
(3) Ownership of a part and control of a part, the aggregate amounting to substantially all.

The Commissioner contends that the evidence in this appeal does not show that the stock owned by Huguley was controlled either practically or in any other manner by the Gamon Company; that, with the exception of a difference in the amount of stock owned, each stood upon the same plane, the fact that the minority stockholder agreed to vote his stock in harmony with the Gamon Company not being important as showing control by that company. He further contends that, upon the incorporation of the Specialty Company, the disunification became complete; and that, whereas formerly the Gamon Company owned the snap-fastener business, conducting it as a branch, it is now only a stockholder in another corporation, which in turn owns and operates the business, the earnings of which belong to another, 20 per cent of which the Gamon Company could never claim; that what was formerly one unit has now become two units; and that the Gamon Company did not legally own or control substantially all of the stock of the Specialty Company. It is further pointed out by the Commissioner that had the Gamon Company owned substantially all of the stock of the Specialty Company, or had it legally controlled substantially all of the stock, then there would have been a real unity, in which case the two corporations could have been considered as identical in substance and therefore treated under the statute as one.

As the Board has pointed out in *Appeal of Isse Koch & Co.*, 1 B. T. A. 624, the control contemplated by the statute is practical and actual control of stock and not technical legal control. We are of the opinion from the evidence in this appeal that the Gamon Company controlled all of the stock of the Specialty Company, and that the interests of the Gamon Company and Huguley were closely affiliated. The Gamon Company owned 80 per cent of the stock, and, while it did not own the remaining 20 per cent, which had been given to Huguley, it actually controlled that stock in the years involved as completely as if it had owned it.

The evidence shows that in July, 1917, the Gamon Company commenced the manufacture of snap fasteners for ladies' dresses, the same being carried on under its name and in its plant with machinery theretofore used for other purposes, but adaptable to the manufacture of snap fasteners. At that time, desiring to increase its output, it acquired for cash the plant of Huguley, a competitor, arranging with him to manage the snap-fastener branch of its business. In August, 1917, taxpayer organized a corporation under the name of the Specialty Products Company for the purpose of carrying on its snap-fastener business. The costs of acquirement of a competitor's plant, improvement of the same, the extension of its own plant for the manufacture of snap fasteners, and the cost of organization of the Specialty Company were paid by the taxpayer. The total of such expenditures, including advances to the Specialty Company, amounted in 1917 to $30,109.08, in 1918 to $57,352.39, and up to December 31, 1919, to approximately $100,000. No one other than the Gamon Company at any time advanced or invested any money or other thing of value in the Specialty Company.

Upon organization in August, 1917, the Specialty Company issued $50,000 common stock, $40,000 represented by 400 shares issued

in the names of the officers of the Gamon Company, the same stock being immediately endorsed by them and placed in the treasury of the Gamon Company; and the remaining $10,000 of stock, represented by 100 shares, being issued in the name of Huguley, the manager of the snap-fastener branch of the taxpayer's business. Huguley had, however, no financial interest in the business of the Gamon Company other than as an employee in the snap-fastener department. He had no connection with the organization of the Specialty Company. He paid nothing for the 100 shares of stock of this corporation issued to him, nor did he at any time invest in the Specialty Company any money or other thing of value. His former business had been acquired for cash by the Gamon Company prior to the organization of the Specialty Company and he had been employed to manage the snap-fastener department of the business at the moderate salary of $50 per week. He had perfected an automatic machine for the manufacture of snap fasteners; therefore, the officers of the Gamon Company felt that the expected success of the Specialty Company would depend to a large extent upon Huguley's efforts and his knowledge of the business. It was their intention, at the time they gave him 100 shares of the stock in the Specialty Company, that he should measure future increases in salary by dividends upon the stock, depending upon his successful operation for the taxpayer of that establishment. At the time of the incorporation of the Specialty Company, Huguley was informed of the intention to issue to him 100 shares of stock in the new corporation, being at the same time informed of the purpose of the organization; also of the fact that the stock would be issued to him only upon the condition that he would at all times accord with whatever action the Gamon Company should take in respect to the affairs of the Specialty Company; that he would always vote the stock as the directors of the Gamon Company desired it voted, and that he would not sell or dispose of the stock, except with the consent of the Gamon Company. This was agreed to by Huguley, the agreement being strictly carried out during the years involved. The evidence also shows that the Gamon Company caused the 100 shares of stock to be issued to Huguley only on condition that it would at all times control the same. The question, therefore, is: Did the Gamon Company own or control substantially all of the stock of the Specialty Company? The uncontradicted facts, in our opinion, show that the Gamon Company actually controlled all the stock. It knew that if the business of the Specialty Company should grow, as was hoped, the question of increased salary would arise. In anticipation thereof, as well as to encourage Huguley to make the business a success by providing an incentive for him in the expectation of receiving dividends measured by the success of the business, this stock was issued to him without consideration, and on condition that it would be controlled by the Gamon Company. In these circumstances, during the years 1918, 1919, and 1920, the Gamon Company, being the owner of 80 per cent of the stock, actually controlled the remaining 20 per cent owned by Huguley until that stock was acquired by it in 1923. Accordingly, it is held that the Gamon Company and the Specialty Company were affiliated during these years.