VAN KANNEL REVOLVING DOOR CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9988.   Promulgated May 8, 1928.

*Melvin G. Palliser, Esq.*, for the petitioner.
*L. L. Hight, Esq.*, for the respondent.

OPINION.

ARUNDELL: Petitioner contends that the actual cash value at date of acquisition of letters patent Nos. 656,062 and 836,843, which it acquired from Carrington in exchange for capital stock, was $250,000, and that it is entitled to include these patents in invested capital at that value, or so much thereof as may be included under the statutory limitations applicable to intangibles. It contends that these same patents had a fair market value, as of March 1, 1913, of $250,000, and that it is entitled to make annual deductions from income for exhaustion of its patents based upon that value.

The evidence offered to support the value claimed for these patents, at the basic dates, is the testimony of four individuals and the earnings of the ten year and seven months period, September 1, 1910, to March 31, 1924. Three of these individuals expressed the opinion that the value of these patents at the basic dates was $250,000; while the fourth, though declining to express his opinion in any exact amount, stated that in his judgment the value of $250,000 fixed by previous witnesses was not at all excessive.

The conditions and circumstances surrounding the acquisition of these patents and the results obtained under them by the petitioner prior to March 1, 1913, presents a far less optimistic situation, at both dates, than that reflected by the opinion evidence of value. For several years the West Virginia company had operated under the so-called "Van-Kannel" patents, letters patent Nos. 656,062 and 836,843, manufacturing and selling collapsible revolving doors, but its operations were not successful and it soon found itself in financial difficulties. When the company passed into the hands of receivers, in 1910, an effort was made to dispose of its assets by other than a forced sale. These were offered to competitors in the revolving door business and to others engaged in building construction. How serious the effort to sell, and how thorough the canvas to secure a buyer, is evidenced by the testimony of Palliser, who was an officer and a director of the company, as well as attorney for the receivers, who states that he tried "to sell these assets to everybody in the revolving door business" and to "everybody in the building business" and "any place where I thought I may be able to get a buyer." Only one offer was received for these assets, and that in the sum of $45,000, but this was not accepted. There followed the sale of these assets at public auction "pursuant to the order of the court, and after advertisement," where they were bid in for $50,000 cash by Carrington as the representative of Blanchard who, until that time, appears to have been a wholly disinterested party. Blanchard then proceeded, with others, to organize the petitioner, and the assets acquired at the receiver's sale were paid in to the petitioner

for $500,000 par value of capital stock. The testimony goes on to show that the parties interested in the organization of petitioner and in securing these assets were aware that competitors of the West Virginia company were manufacturing and selling collapsible revolving doors; that numerous court actions would be necessary to eliminate these competitors from the collapsible revolving door field; and that substantial sums would have to be expended in the prosecution of infringement suits. Twelve such actions were subsequently brought, five of them prior to March 1, 1913, with final adjudication in only one prior to that date. These facts, undisputed in the record, clearly lead to the conviction that the price paid by Carrington for the assets of the West Virginia company at the receiver's sale represented their actual cash value; and the presumption that such is the case is entitled to prevail until overcome by clear and convincing evidence to the contrary.

In the light of the foregoing circumstances, it seems to us that we should have been given something more upon which to test the reasonableness of the opinions of witnesses as to values than the mere generalizations that characterize their testimony. Blanchard's testimony suggests hardly more than a belief that the patents, if acquired, would ultimately prove successful and result in large earnings. He knew nothing about the actual cash value of the patents, when paid in to the petitioner, testifying that he was not competent to state what that value may have been; and his whole testimony affords no information which would be helpful to us in reaching a conclusion as to values. The testimony of Palliser, Gillis, and Johnson contains much of interest as to the history of the litigation of these patents, but is void of facts which lend support to their general opinions of values. Well versed in patent laws and possessing the experience and qualifications to successfully cope with complex patent litigation, the opinions of these witnesses, undoubtedly, are entitled to considerable weight and great respect in matters involved in patent litigation, but they showed no qualifications which would entitle their opinions of value to the weight which usually attaches to those of expert appraisers, or such as would justify a blind acceptance of their opinions in the face of undisputed facts which strongly indicate those opinions to be in error.

The earnings of the petitioner from September 1, 1910, to March 31, 1924, the latter date being four months after the expiration of the later of the two patents, were placed in evidence by the petitioner to support the values claimed for the patents, as of date of acquisition and March 1, 1913. If there were known facts or circumstances, at the date of acquisition, which would afford a basis for a reasonable prognostication of future earnings from the employment of these patents, their existence has not been shown, and the earnings do not,

therefore, constitute proof of the value of the patents at the date in question. As we said in *Saenger Amusement Co.*, 1 B. T. A. 96:

The determination of values of assets paid in for stock must be made in the light of all available evidence existing at the date of the acquisition. Subsequent earnings may be used only to corroborate or substantiate a valuation based on the reasonable expectation of future earnings. A valuation, however, based upon the expectation of future earnings must be determined in the light of known facts existing at that time or upon past experience. A hope of future earnings not based upon some known facts or circumstances, or a mere guess by the owners as to the future earning capacity, however accurate it may be proven to be by subsequent events, does not prove value. Future earnings alone are not proof without reference to the facts from which they could have been reasonably anticipated.

See also *Gamon Meter Co.*, 1 B. T. A. 1124.

Furthermore, there has been no showing of the amount of tangible properties employed in the business and associated with the patents in the production of these earnings; hence, it is not possible to make any determination as to what part of these earnings is directly attributable to the patents in question.

After carefully considering the entire evidence, we are of the opinion that the properties formerly owned by the West Virginia company and acquired by Carrington at the receiver's sale, which were acquired by petitioner in exchange for $500,000 par value of its own capital stock, had an actual cash value, at the date of acquisition by petitioner, of $50,000.

As to the March 1, 1913, value of patents Nos. 656,062 and 836,843, the witnesses uniformly testified that in view of the favorable court decision on the validity of the patents prior to that date, such value was at least equal to the value of the patents when acquired by petitioner in 1910, to wit, $250,000. To what extent the lone favorable decision on the validity of the patents in the only case finally adjudicated prior to March 1, 1913, affected the fair market value of the patents as of that date we are unable to determine by any facts of record. Any estimate in that respect would be a matter of mere conjecture. It at least had no immediate effect upon the operations and earnings of petitioner, for, during several years thereafter, there was no appreciable increase in the number of revolving doors sold and the earnings are far below those of prior years, notwithstanding appreciable increases in the average selling price of doors. For the three year period, September 1, 1910, to August 31, 1913, the earnings amounted to $63,429.72, an annual average of $21,143.24. At March 1, 1913, patent No. 656,062 had a remaining life of 4 years 5 months and 15 days, and patent No. 836,843 a remaining life of 10 years 8 months and 28 days, and the average remaining life for the two patents was 7 years 7 months and 7 days. Giving consideration to

these earnings, in connection with all the other evidence, we are of the opinion that the fair market value of these two patents, as of March 1, 1913, was $80,000. We have been given no facts upon which we could base a segregation of this value between the two patents. Palliser testified that patent No. 836,843 was the more valuable of the two; while Johnson testified that patent No. 656,062, being the basic patent, was more valuable than the later one. In this state of the record we can not do otherwise than to hold that the patents were equally valuable, and that the March 1, 1913, value is allocable to the two patents in the amount of $40,000 each.

This brings us to a decision of the questions raised by the petition: (1) The value which petitioner is entitled to include in the invested capital of the years in controversy, in respect of the properties which it acquired in 1910, in exchange for stock; and (2) the deductions which the petitioner is entitled to make from income on account of exhaustion of its patents. We have already found that the properties acquired by the petitioner in 1910, in exchange for $500,000 par value of capital stock, had an actual cash value, at the date of acquisition of $50,000. But the petitioner's proof does not go far enough to show what part of said value of $50,000 it is entitled to have included in invested capital. The properties acquired by the petitioner, in addition to letters patent Nos. 656,062 and 836,843, included a group of fifteen other United States letters patent and one application for patent, a group of three Canadian patents, an order for 142 shares of the capital stock of the Northwestern Revolving Door Co. and 299 shares of the Canadian Revolving Door Co., any capital stock of the Dyer Revolving Door Co. owned by the transferer, and contracts for revolving doors aggregating about $50,000. Of the seventeen patents thus acquired, No. 656,062 expired in 1917, a date prior to the taxable years under consideration; and since seven other patents bear serial numbers lower than 656,062, it would appear that they also had expired before the taxable years in question. If the shares of capital stock of the three revolving door companies were owned by the petitioner during the taxable years, that fact has not been made known to us. It would also appear that the contracts for revolving doors had been either abandoned or completed prior to the taxable years in question. If abandoned, they could not, of course, be included in invested capital; and, if they have been completed, they have been undoubtedly converted into some other form of asset which has been included by respondent in invested capital. In short, of the entire properties acquired by the petitioner in 1910, we do not know, except for patent No. 836,843, what were owned and in actual use during the taxable years in question; and we are unable for lack of evidence to say what part of the total value of $50,000 is assignable to patent No. 836,843.

The invested capital determined by respondent, for each of the years in controversy, exceeds what appears to be the petitioner's actual paid-in capital. Under the circumstances, we are unable to find error in respondent's action in excluding from invested capital of the years in controversy the claimed value for good will and patents.

We have also found that the March 1, 1913, value of patents Nos. 656,062 and 836,843 was $80,000, and that this value is assignable $40,000 to each patent. Patent No. 656,062 expired prior to the taxable years in controversy, hence petitioner is not entitled to any deduction from income for exhaustion in respect of that patent. Patent No. 836,843 had a remaining life at March 1, 1913, of 10 years 8 months and 28 days, and on the basis of a March 1, 1913, value of $40,000, it is entitled to a deduction from income, for each of the years in question, on account of exhaustion in the amount of $3,759.05.

No proof was offered to show error in respondent's action in reducing invested capital on account of income and profits taxes for prior years. *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

*Judgment will be entered on 10 days' notice, under Rule 50.*