## APPEAL OF THE VISCOSE CO.

Docket No. 3164.    Submitted July 16, 1925.    Decided January 26, 1926.

Taxpayer is entitled to have its profits tax computed under the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918.

*Virgil Y. Moore, Andrew T. Smith,* and *Richard E. Dwight, Esqs.,* for the taxpayer.

*A. H. Fast, Esq.,* for the Commissioner.

Before STERNHAGEN, LANSDON, and LOVE.

This is an appeal from the determination of a deficiency in income and profits taxes for the calendar years 1917, 1918, and 1919, in the aggregate amount of $536,126.92. The two issues involved are, (1) whether the Board has jurisdiction under the Revenue Act of 1924 to hear and determine the appeal, and (2) whether the taxpayer is entitled to special relief by having its tax liability determined and assessed under the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918.

### FINDINGS OF FACT.

1. The taxpayer is a Pennsylvania corporation with its principal office at Marcus Hook.

2. On December 3, 1921, the Commissioner mailed the taxpayer a letter proposing an assessment of additional income and profits taxes for the calendar years 1917, 1918, and 1919, and granting 30 days from its date within which to protest and appeal from the findings thereof. Before the expiration of such 30 days, and on

December 31, 1921, the taxpayer applied to the Commissioner for an extension of time within which to file its written protest and appeal and also asked for an oral hearing. The extension of time was given and an oral hearing was granted and set for January 18, 1922. On January 16, 1922, said written protest and appeal were filed and accepted by the Commissioner. The oral hearing was held on January 18, 1922, and the protest and appeal considered. Prior to January 17, 1922, and at a time when the collection of such tax would not have been jeopardized by delay until after such hearing, and was not believed by the Commissioner to be so jeopardized, the proposed assessment, in the amount of $997,259.74, was made. The taxpayer had no knowledge of such assessment until on or about February 20, 1922, at which time, upon complaint by the taxpayer, the Commissioner directed the collector of internal revenue for the taxpayer's district to file his, the said collector's, claim in abatement of $671,181.59 of such alleged assessment of taxes (the taxpayer at the time paying the remainder thereof, namely, $326,078.15), which the said collector did, and the same was accepted by the Commissioner. The taxpayer did not at that time, nor has it since, filed any claim in abatement of these taxes, or any taxes involved in this appeal. After February 20, 1922, the Income Tax Unit continued to consider the assessment proposed in its letter of December 3, 1921, and announced its findings in a letter dated August 29, 1922, which also granted the taxpayer 30 days within which to appeal. On September 7, 1922, the taxpayer did appeal to the Committee on Appeals and Review. On March 2, 1923, the Unit forwarded the case to the Committee on Appeals and Review, with an ordinary letter of transmittal, as provided by Treasury Decision 3492, which, at that time, governed appeals or proposed additional assessments. On May 23, 1923, a hearing on appeal was granted to the taxpayer by the Committee on Appeals and Review. On January 19, 1924, a supplemental brief was filed by the taxpayer with the Committee. On January 29, 1924, the Committee granted a further hearing to the taxpayer and its representative. In accordance with the request of the Committee made at the hearing of January 29, 1924, additional information was filed with it on February 11 and 15, 1924. At a hearing on October 15, 1924, before the Review Division of the Solicitor's office, further information was filed. The taxpayer received a letter dated February 9, 1925, containing the Commissioner's final determination of the appellant's tax liability for the years in question. In that letter the Commissioner computed the taxpayer's excess and war-profits taxes under the normal provisions of the Revenue Acts and denied relief under section 210 of the Revenue Act of 1917 and sections 327 and 328 of the Revenue Act of 1918.

3. During the taxable years in question, the taxpayer was engaged in the manufacture and sale of artificial silk yarn or Rayon. A brief history of this industry is essential to a clear understanding of the situation from which this appeal arises. Courtaulds, Ltd., of England, was the first successful producer of artificial silk. Since about 1904 this company has been the largest and most successful concern in this industry in the world. About the same time there was operating in the United States the General Artificial Silk Co., which, however, was unsuccessful and went into the hands of a receiver. The Genasco Silk Co., organized as its successor in 1904, operated with indifferent success until 1908, when it sold its assets, including patents and secret processes in the United States, to Courtaulds, Ltd. In 1909, Courtaulds, Ltd., organized the American Viscose Co., hereinafter sometimes designated as the predecessor, or the predecessor corporation, in the United States, which was successful from the beginning. This new company used many patents, secret processes, and refinements and improvements obtained from Courtaulds, Ltd. Its engineers and chemists visited and studied the Courtaulds plant, brought the latest development in the art to the United States from time to time, and carefully guarded all secret processes and machinery for producing artificial silk yarn.

As a precaution against the disclosure of its processes employed in constructing its machinery, the taxpayer made its own designs, placed its orders for parts, with detailed descriptions, with scattered manufacturers, and then assembled and completed the parts so constructed in accordance with its own secret specifications. Experimentation and development work were continually carried on to better the processes and machinery for production. One particularly striking success was the elimination of fuzz from the yarn. It seems that fuzz and the weakness of the yarn prevented its general use in certain knit goods. The improvements remedying these defects were worked out and developed during 1914, 1915, and 1916, and were first successfully applied during 1916. This enabled the taxpayer to enter the enlarged fields of knit goods and fine needle trade. Increased income resulting from this broadened market, however, was not realized in any large measure until 1918 and 1919. The taxpayer and its immediate successor were by far the largest manufacturers of artificial silk yarn in the United States.

4. The Viscose Co., hereinafter called the taxpayer, was organized on May 20, 1915, with an authorized capitalization of $10,000,-000, and on that date purchased all the assets of the predecessor corporation. The capital stock of the American Viscose Co. was owned by Courtaulds, Ltd. In consideration of the transfer of the

assets of the predecessor corporation to it, the taxpayer issued to the American Viscose Co. $9,999,500 of its capital stock, paid $500 cash, and acquired all the contracts and assumed all the liabilities of the predecessor. The stock so issued was then distributed to the stockholders of the American Viscose Co. in exact proportion to their holdings in that corporation.

The tangible assets of the predecessor were carried upon its books at $3,731,559.58 and the liabilities at $99,977.31, indicating a net book value of tangible assets of $3,631,582.27. The taxpayer set up the same values upon its books and $500 for cash paid, making the value of its net tangible assets $3,632,082.27. To balance the stock account, this latter sum was subtracted from $10,000,000, the par value of the issued stock, leaving a remainder in the amount of $6,367,917.73, which was entered upon the books of the taxpayer as good will. A comparative statement of assets and liabilities of the taxpayer and its predecessor as of May 20, 1915, as shown upon their books, is as follows:

| | American Viscose Co. | The Viscose Co. |
|---|---|---|
| **ASSETS.** | | |
| Cash | $602,682.68 | $603,182.68 |
| Accounts receivable, net | 365,665.53 | 365,665.53 |
| Inventories | 352,675.88 | 352,675.88 |
| Plant assets | 2,906,597.61 | 2,906,597.61 |
| Hook Trading Co | 3,000.00 | 3,000.00 |
| Deferred charges | 10,410.68 | 10,410.68 |
| Good will | | 6,367,917.73 |
| | 4,241,032.38 | 10,609,450.11 |
| **LIABILITIES.** | | |
| Accounts payable | 5,326.12 | 5,326.12 |
| Accruals payable | 92,151.19 | 92,151.19 |
| Estimated liquidation charges | 2,500.00 | 2,500.00 |
| Reserve for depreciation on plant assets | 509,472.80 | 509,472.80 |
| Capital stock | 1,600,000.00 | 10,000,000.00 |
| Surplus | 2,031,582.27 | |
| | 4,241,032.38 | 10,609,450.11 |

The contract of May 20, 1915, hereinafter more fully described, whereby the American Viscose Co. acquired various patents from Courtaulds, Ltd., and issued notes therefor in the amount of $5,000,000, is not represented in the above statement.

5. By the purchase of the assets of the American Viscose Co. on May 20, 1915, the taxpayer acquired all the tangible and intangible property owned by that corporation. The principal items of value (in addition to cash, accounts receivable, inventories, etc., over which there is no controversy) were:

(1) Plant and equipment.

(2) Contract with Doctor Ernst.

(3) Contract with Mr. Slater.

(4) Patents.

(5) Secret processes and refinements.

(6) Future patents and processes with Courtaulds, Ltd.

(7) Good will.

*Plant and equipment.*—The predecessor corporation carried on its books the item "Plant Assets, $2,906,597.61." This same amount was set up on the books of the taxpayer at the time of the transfer. It was the practice of the predecessor to enter upon its books the bare cost of labor and material used in the construction of its plant and machinery. For the purpose of guarding the secrets of the trade, it would have the parts of the machinery manufactured at different places. These parts would then be finished up at the factory, in accordance with the secret specifications of its own expert engineers, and there assembled into completed machines. The books as kept did not show the actual cost of completed machines. They did not reflect, in connection with the machines, the overhead expenses, such as salaries for supervision and engineering costs, or the increased value of the completed machines. No appraisal of the plant and equipment was ever made by the predecessor corporation, the taxpayer, or the Commissioner, but the value of such property was in excess of the amount carried upon the books of the taxpayer.

*Contract with Doctor Ernst.*—Dr. Charles A. Ernst was closely associated with the artificial silk industry from its inception. He was a chemist with the General Artificial Silk Co. in 1904 and was chief chemist and plant manager of the Genasco Silk Co., the successor of that concern, until 1908, at which time was employed by Courtaulds, Ltd., and went to England, where he studied and worked until 1909. He was then sent back to the United States by Courtaulds, Ltd., as chief chemist and general manager of the American Viscose Co. Upon the acquisition of the American Viscose Co. by the taxpayer, he continued at first in the same position, but later became president. During his employment with the taxpayer and its predecessor he devised, perfected and patented many appliances and processes necessary for the profitable manufacture of artificial silk yarn. He also made numerous inventions and improvements, which were not patented but were held and used as secret processes. He was instrumental in the development of the method of eliminating fuzz from the yarn, which made it usable for knit goods, as heretofore described. A large part of the success of the predecessor and the taxpayer was due to his activities as chemist and plant manager.

Doctor Ernst's contract with the predecessor was transferred to the taxpayer. Important provisions of the contract of employment were:

(1) He should not engage in or carry on any business with any other company but should devote himself and his whole time to the company.

(2) He should not divulge to any other concern any information as to the processes, machinery, chemicals, etc., used by the company.

(3) He should at all times endeavor to discover and invent new processes, machinery, etc., and remedies for defects, all of which he was to divulge to the company.

(4) All discoveries and inventions connected with the business, whether patented by Doctor Ernst or not, should become the property of the company.

(5) He should not, within four years after leaving the company, directly or indirectly, be identified with any other concern in the same business.

(6) The contract could be assigned to a successor company.

*Contract with Mr. Slater.*—Herbert P. Slater was chief engineer of the American Viscose Co. from its beginning, but, prior to the organization of that concern, he went to Courtaulds, Ltd., in England, to examine and study all the engineering features of that company. During his subsequent employment, he made numerous valuable improvements in the machinery of the taxpayer and its predecessor. All such improvements were turned over to the company without expense, in accordance with the terms of his employment contract. He invented a particularly valuable improvement on the spinning machine, whereby the output per unit was increased 20 to 30 per cent. He was one of the most expert and experienced engineers in this particular business in this country. The provisions of his contract of employment with the American Viscose Co. were similar to those of the contract with Doctor Ernst. This contract was assigned to the taxpayer, and Slater has continued as its chief engineer until the present time.

*Patents.*—All the patents owned or used by the predecessor were included in the transfer of assets to the taxpayer. The American Viscose Co. also was using, on a royalty basis, certain specified patents owned by Courtaulds, Ltd. The percentages of profits paid for the use of such patents were: 1913, 18 per cent; 1914, 15 per cent; 1915, 14 per cent; and 1916, 12 per cent, and an additional bonus of $2,000,000 was agreed to be paid, in annual installments of $500,000 each. Just prior to the transfer of the assets, this royalty arrangement was canceled and a new contract was entered into by the terms of which the patents were to be transferred outright to the American Viscose Co. for a consideration of $5,000,000. This contract to purchase was transferred to the taxpayer. The patents

so acquired at the time of the transfer were indispensable to the predecessor corporation and the taxpayer in the successful operation of the business.

*Secret processes and refinements.*—In addition to patents, the American Viscose Co. developed and used numerous valuable secret processes and refinements in the manufacture of its product, all of which were essential to the profitable operation of its business. Such secret processes and refinements consisted of the adjustment and concentration of chemicals and the regulation of temperatures in different steps in the manufacture of artificial silk. These were all included in the transfer of the assets to the taxpayer and were used by it.

*Future patents and processes of Courtaulds, Ltd.*—The predecessor corporation had a contract by the terms of which it was entitled to use all future patents and secret processes obtained or developed by Courtaulds, Ltd., and to have access to the plants of that concern. It frequently took advantage of this provision and sent engineers and chemists to England to study the processes and adapt them to its own use. This right was also transferred to the taxpayer. The pertinent part of the contract was:

2. Courtaulds agrees that, during the life of such one of the said Patents as shall longest continue, Viscose, or its Nominee, may, in the United States, use all Patents, Improvements, Machinery and Processes in and for the manufacture of artificial silk, which Courtaulds may now or hereafter own, discover, invent, obtain or acquire, and that, during the period aforesaid, Courtaulds will, to the extent of its knowledge, give to Viscose, or its Nominee, the fullest information and disclosure as to all machinery and processes, secret and otherwise, in reference to such manufacture and extend to Viscose, or its Nominee, full inspection from time to time of its factories for such manufacture.

6. No value was set up upon the books of the taxpayer or its predecessor for any of the assets enumerated and described in the preceding paragraph, and it was impossible on May 20, 1915, or at any time since, satisfactorily to determine such values.

7. During the year 1916, negotiations were entered into between the taxpayer and the Du Pont interests for the sale of the majority of the stock of the taxpayer. Courtaulds, Ltd., the principal stockholder of the taxpayer, at first fixed the value of all the assets, including both tangibles and intangibles, at $50,000,000, but later this was reduced to $48,000,000. The Du Pont interests took an option at the latter figure. No sale or agreement of sale resulted from such option and negotiations.

8. Artificial silk yarn is manufactured by four different general processes well known in the trade. All involve the same general chemical processes applied along different lines. The Viscose process is but one of the four used by a number of manufacturers. The secret processes of the taxpayer, as well as of the other manu-

facturers, consist of numerous adjustments of chemicals, timing, and temperatures during the various stages in the manufacture of the product, and of designs and specifications used in constructing the necessary machinery. The method of manufacturing mercerized cotton yarn is somewhat similar to that of manufacturing artificial silk yarn. The same raw materials are used and the finished products are similar, except that in the cotton yarn the change producing the luster is upon the surface instead of throughout the entire thread as in the artificial silk yarn. Mercerized cotton yarn and artificial silk yarn are used for the same purposes, seek the same markets, and are in competition with each other.

9. The net income of the taxpayer, as adjusted by the Commissioner, and the invested capital for some of the years, are as follows:

| Years. | Income. | Invested capital allowed by Commissioner. |
|---|---|---|
| 1915 | $2,752,918.43 | |
| 1916 | 9,116,224.07 | |
| 1917 | 13,793,428.89 | $10,916,472.48 |
| 1918 | 15,175,725.66 | 17,263,199.06 |
| 1919 | 29,420,786.12 | 22,926,296.80 |

10. The Commissioner's final determination of the excess and war-profits taxes of three manufacturers of mercerized cotton yarn, their invested capital, gross income, net income, and other relevant facts, were as follows:

| Company. | Year. | Invested capital. | Net profits. | Profits taxes credit. | Profits tax. | Percentage. |
|---|---|---|---|---|---|---|
| Nyanza Mills, Inc | 1918 | $1,682,380.97 | $220,340.61 | $165,838.09 | $43,602.01 | 19.89 |
| | 1919 | 1,710,254.99 | 314,223.28 | 139,820.40 | 34,880.56 | 8.73 |
| | 1920 | 2,252,826.31 | 223,150.49 | 183,226.10 | 7,894.80 | |
| Aberfoyle Manufacturing Co | 1917 | 2,643,115.34 | 712,587.00 | 207,207.09 | 121,342.87 | 18.08 |
| | 1918 | 3,076,787.62 | 661,811.08 | 249,143.01 | 280,905.86 | 42.44 |
| | 1919 | 3,401,088.64 | 2,168,842.57 | 275,087.09 | 676,476.07 | 31.37 |
| Hampton Co | 1919 | 3,145,739.17 | 1,012,321.46 | 254,659.13 | 219,802.62 | 22.6 |

A similar statement in respect of the taxpayer, as determined by the Commissioner, is as follows:

| Company. | Year. | Invested capital. | Net profits. | Profits taxes credit. | Profits tax. | Percentage. |
|---|---|---|---|---|---|---|
| Viscose Co. (Commissioner's computation in deficiency letter dated Feb. 9, 1925) | 1917 | $10,916,472.48 | $13,793,428.09 | $985,482.52 | $6,965,480.63 | 50.57 |
| | 1918 | 17,262,704.40 | 15,175,725.66 | 3,502,718.17 | 10,635,725.66 | 68.64 |
| | 1919 | 22,926,296.80 | 29,420,786.12 | 1,837,103.74 | 10,483,841.82 | 38.00 |

DECISION.

The deficiency, if any, should be computed in accordance with the following opinion. Final determination will be settled on 15 days' notice, in accordance with Rule 50.

OPINION.

LANSDON : The issues raised in this appeal are (1) jurisdiction of the Board, and (2) the right of the taxpayer to special assessment under the provisions of section 210 of the Revenue Act of 1917 and sections 327 and 328 of the Revenue Act of 1918.

As to the jurisdiction of the Board, we are of the opinion that the facts, as set forth in our findings of fact, put this appeal clearly within the rule laid down in the *Appeal of Ormsby McKnight Mitchel*, 1 B. T. A. 143, and *Appeal of Boston Structural Steel Co.*, 1 B. T. A. 602. We therefore hold that the Board has jurisdiction.

The provisions of the statutes relating to special assessment under which the taxpayer seeks relief are as follows:

Sections 210 of the Revenue Act of 1917, and 327 and 328 of the Revenue Act of 1918, provide:

SEC. 210. That if the Secretary of the Treasury is unable in any case satisfactorily to determine the invested capital, the amount of the deduction shall be the sum of (1) an amount equal to the same proportion of the net income of the trade or business received during the taxable year as the proportion which the average deduction (determined in the same manner as provided in section two hundred and three, without including the $3,000 or $6,000 therein referred to) for the same calendar year of representative corporations, partnerships, and individuals, engaged in a like or similar trade or business, bears to the total net income of the trade or business received by such corporations, partnerships, and individuals, plus (2) in the case of a domestic corporation $3,000, and in the case of a domestic partnership or a citizen or resident of the United States $6,000.

For the purpose of this section the proportion between the deduction and the net income in each trade or business shall be determined by the Commissioner of Internal Revenue in accordance with regulations prescribed by him, with the approval of the Secretary of the Treasury. In the case of a corporation or partnership which has fixed its own fiscal year, the proportion determined for the calendar year ending during such fiscal year shall be used.

SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

(a) Where the Commissioner is unable to determine the invested capital as provided in section 326;

(b) In the case of a foreign corporation;

(c) Where a mixed aggregate of tangible property and intangible property has been paid in for stock or for stock and bonds and the Commissioner is unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock and for bonds, respectively;

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified

in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under section 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

SEC. 328. (a) In the cases specified in section 327 the tax shall be the amount which bears the same ratio to the net income of the taxpayer (in excess of the specific exemption of $3,000) for the taxable year, as the average tax of representative corporations engaged in a like or similar trade or business, bears to their average net income (in excess of the specific exemption of $3,000) for such year. In the case of a foreign corporation the tax shall be computed without deducting the specific exemption of $3,000 either for the taxpayer or the representative corporations.

In computing the tax under this section the Commissioner shall compare the taxpayer only with representative corporations whose invested capital can be satisfactorily determined under section 326 and which are, as nearly as may be, similarly circumstanced with respect to gross income, net income, profits per unit of business transacted and capital employed, the amount and rate of war profits or excess profits, and all other relevant facts and circumstances.

\*         \*         \*         \*         \*         \*         \*

The taxpayer has presented a great mass of impressive facts and persuasive arguments in support of its contention that it is entitled to special assessment for the determination of its tax liability for the years involved in this appeal. The Board must base its conclusions on the answers to the following questions to be made from the testimony offered at the hearing:

1. Is the Commissioner unable satisfactorily to determine invested capital?

2. Was there a mixed aggregate of tangible and intangible property paid in for stock of such nature that the Commissioner is unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock?

3. During the taxable years in question, were there such abnormal conditions affecting the capital or income of the taxpayer as would work an exceptional hardship, evidenced by gross disproportion between the tax computed without the benefit of the special assessment sections and the tax computed by reference to representative corporations?

4. Were there available for use as comparatives other representative corporations engaged in a trade or business like or similar to that of the taxpayer and similarly circumstanced?

For answer to the first question, the Commissioner contends that he is able satisfactorily to determine invested capital. He relies on

the figures entered upon the books of the taxpayer at the date of the acquisition of the assets of the American Viscose Co. as the basis of his determination. The taxpayer was organized with capital stock of $10,000,000. The American Viscose Co. carried on its books tangible assets at the net book value of $3,631,582.27. The taxpayer transferred the same value for tangible assets, plus $500 cash paid in, to its books. Subtracting this amount from $10,000,000 leaves a remainder of $6,367,917.73, which was charged against stock issued for good will. The parties agree that no actual appraisal of values acquired from the American Viscose Co. was attempted by the taxpayer or the predecessor corporation, and that the Commissioner has never made an appraisal of such tangible or intangible assets.

In controversies involving invested capital, the burden ordinarily is upon the taxpayer to sustain by proof the values set up on its own books. In this appeal, however, it is necessary for the taxpayer to go one step further and to prove that the figures entered on its books did not reflect the true values, which, it contends, were very much greater. There are several outstanding circumstances which support the taxpayer's contention that the assets had a far greater value than was indicated by the book entries. It is undisputed that the book values for machinery and equipment represent only the actual cost of material and labor. The machinery parts were ordered in rough and unfinished form from different factories and then completed and assembled in secrecy by employees of the taxpayer's predecessor. No account was taken on the books of the overhead expense incurred in this process, such as salaries and engineering costs.

Several other facts strongly support the contentions of the taxpayer, noteworthy among them the acquisition of (1) valuable patents, (2) the contracts of employment with Ernst and Slater, (3) the secret processes and refinements acquired from the predecessor, (4) the contract rights to future patents and secret processes developed by Courtaulds, Ltd., and (5) future benefits from developments already under way. No attempt was made to reflect the true value of any of these tangible assets upon the books of the predecessor corporation or the taxpayer. It is not necessary to analyze these assets in detail, but we can not escape the conclusion that such acquisitions were of very great value and were substantial contributing factors in earning the subsequent income of the taxpayer. In this connection, also, the taxpayer points out that, a short time after its acquisition of the property, negotiations were carried on at arm's length with the Du Pont interests on the basis of a $48,000,000 valuation. While this is not conclusive evidence of such value, it certainly supports the contention that the capitalization of the taxpayer

at $10,000,000 and the issuance of stock in that amount at par value for the assets of the predecessor corporation were not regarded by the taxpayer or its competitors as a reflection of the true values of the assets.

An affirmative answer to the question relating to "mixed aggregate of tangible and intangible property," as set forth in section 327 (c), also would entitle the taxpayer to relief. Paragraph (c) of section 327 of the Revenue Act of 1918 provides:

SEC. 327. That in the following cases the tax shall be determined as provided in section 328:

\* \* \* \* \* \* \*

(c) Where a mixed aggregate of tangible property and intangible property has been.paid in for stock or for stock and bonds' and the Commissioner is unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock and for bonds, respectively.

How is it possible for the Commissioner to determine the respective values of the several classes of tangible and intangible property acquired by the taxpayer in exchange for stock? The values set up on the books of the taxpayer for tangible property represent only the bare cost of material and labor for plant and equipment and do not include either the actual cost of the complete equipment or the increment in value resulting from such construction. The book value of the tangible property acquired from the predecessor corporation is the basis or starting point for the Commissioner's computation of invested capital. It is clear to us that he has reasoned from wrong premises. Neither the Commissioner nor the taxpayer has made any attempt to determine or distinguish the respective values of the patents acquired, the contract rights to future patents and processes of Courtaulds, Ltd., or of the plant and equipment as completed. The taxpayer, through its officers who are in a position to know, contends that it was and is impossible satisfactorily to appraise or compute those values, except to ascertain that, in the aggregate, they are several times the amount of the original capitalization of $10,000,000. We are convinced from the testimony that the values of these elements, however indistinguishable as to their respective proportions and classes, were in the aggregate far in excess of the values determined by the Commissioner.

Now, as to abnormalities, we believe the facts speak for themselves. Our attention is called to the large net income of the taxpayer, as found by the Commissioner, and also to the small proportionate amount of invested capital allowed for the same years.

The net income of the taxpayer and the invested capital, as computed by the Commissioner for some of the years, is as follows:

| Years. | Income. | Invested capital allowed by Commissioner. |
|---|---|---|
| 1915 | $2,752,918.43 | |
| 1916 | 9,116,224.07 | |
| 1917 | 13,793,428.89 | $10,916,472.48 |
| 1918 | 15,175,725.66 | 17,263,199.06 |
| 1919 | 29,420,786.12 | 22,926,296.80 |

A high rate of profit upon a normal invested capital, of course, is not in itself an abnormality, but, taken in connection with the facts and circumstances of this case, the computation of tax liability without the benefit of the relief sections certainly would work an exceptional hardship upon the taxpayer. What are abnormalities in this case? The situation, viewed as a whole, strikingly impresses us as an unusual and abnormal condition. It is so unusual and different from the ordinary course of business organizations that, aside from the commercial aspects, it is highly interesting as the history of a successful industry. Here is pictured the early struggles of the artificial silk industry in the United States; the organization, unsuccessful operation, and failure of the preceding pioneer corporations, the American Artificial Silk Co. and the Genasco Silk Co.; the organization of the American Viscose Co. by Courtaulds, of England, which purchased the Genasco Silk Co., and then the rapid development and final and complete success of the American Viscose Co., which became the leading manufacturer in America of artificial silk yarn. During all this time there were constant developments and improvements in the industry. Specialists were employed, many patents were acquired from time to time, and numerous secret processes and refinements were added to reduce manufacturing costs and improve the product.

There are a number of conditions affecting the capital and income of the taxpayer which seem to differentiate it from corporations the taxes of which are computed without the benefit of the relief sections.. We will mention a few. The stockholders and stockholdings of the predecessor corporation and the taxpayer were identical. There was no necessity for appraisal or valuation of the assets transferred at the date of reorganization. The taxpayer was in fact trading with itself, not at arm's length with strangers, and therefore made no attempt to reflect the value of the acquired assets on its books. This is substantiated to some extent by the fact that the Commissioner computed the invested capital for 1917 at approximately $11,000,000,

while, during the preceding year, negotiations were had with the Du Pont Co. on a basis of a $48,000,000 valuation. Another abnormal condition, reflected in the income, resulted from the successful elimination of fuzz from the artificial silk yarn and the strengthening of the yarn so that it was suitable for the knit-goods trade. As shown in our findings of fact, this development was well under way in the years of 1914 and 1915, during the régime of the predecessor, and it was finally completed in 1916. Some time was required to develop new markets made possible by this improvement, so that the resulting income was not realized until 1918, 1919, and subsequent years.

A number of other circumstances are called to our attention as abnormalities, upon which we have touched in discussing other points, such as the plant account as shown on the books, the large income, and the inconsistent results of determining the tax by statutory computation. There is no doubt in our minds that all of these circumstances, taken together, put the taxpayer in the abnormal class, within the meaning of the statute.

Before the statutory provisions under which the taxpayer seeks relief can be applied, it is necessary to identify proper comparatives. Are there other representative corporations engaged in a trade or business like or similar to that of the taxpayer which may be used as comparatives? The Commissioner contends that the unusual conditions proved herein are the result of a monopoly and that there are no other corporations similarly circumstanced. The testimony discloses that there are at least four methods of manufacturing artificial silk yarn, of which the Viscose process is but one. There are a number of other concerns in the United States which are manufacturing artificial silk yarn by the Viscose process, all of which have their own secret processes and refinements. However, none of these approaches the taxpayer in the magnitude of output, volume of earnings, or command of markets. The taxpayer contends, therefore, that it is not a monopoly, but is in direct competition, not only with the producers of artificial silk yarn, but with the manufacturers of mercerized cotton yarn, of which there are several who are similarly circumstanced to the taxpayer with respect to gross income, net income, etc. It has proved that its product is used in the same class of articles and sold to the same customers, and that the prices it obtains rise and fall with the prices of mercerized cotton yarn. We are convinced that the taxpayer was not a monopoly and that there are proper comparatives, within the meaning of the statute. Mere superiority of product and success in manufacturing and marketing do not constitute a monopoly. It is an extremely

difficult task for any taxpayer to present conclusive evidence of suitable comparatives, because such information is peculiarly within the knowledge of the Commissioner. In this appeal, however, the taxpayer has succeeded in presenting the data necessary to identify a few representative corporations, within the meaning of the statute.

In the light of all the evidence, the taxpayer has convinced us that the book entries assigning values to the tangible and intangible assets acquired by the taxpayer from the American Viscose Co. were not intended to reflect and did not reflect the true value of such assets; that it is impossible to determine the values of the mixed aggregate of tangible and intangible property, acquired in exchange for stock on May 20, 1915, and that, during the years in question, many abnormal conditions affecting capital and income of the taxpayer existed and resulted in exceptional hardship in the computations of tax liability without the benefit of the special assessment provisions of the statute. We are of the opinion, therefore, that the taxpayer is entitled to have its tax computed under the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918.

The taxpayer in its brief, after reciting the information available to the Commissioner for the purpose of comparatives in the determination of the tax, says:

We shall not go further for the present than to ask Your Honors, after making the findings of fact hereinbefore requested, to refer this case back to the Commissioner for a determination of the tax liability of the taxpayer under the provisions of Rule 50 of this Board's Rules of Practice.

The tax should be computed as follows: The Commissioner should select comparatives and determine the amount of the deficiency after the computation of the tax under the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918, and notice of such computation should be served as provided in Rule 50, the right being reserved to the taxpayer to object to said computation and to show cause at a hearing had thereon why the computation of the Commissioner should not be adopted as a basis of final settlement.

On reference to the Board, JAMES, LITTLETON, SMITH, and TRUSSELL dissent.

ARUNDELL not participating.