Superior Tube Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 16104, 16553. Promulgated September 10, 1930.

*Phil D. Morelock, Esq.*, and *Dudley Doolittle, Esq.*, for the petitioner.

*Arthur H. Murray, Esq.*, for the respondent.

OPINION:

Lansdon: The respondent has asserted deficiencies in income and profits taxes for the fiscal years ended July 31, 1920, and July 31, 1921, in the respective amounts of $166.98 and $1,559. The petitioner alleges that the respondent erred in denying its application for special assessment in each of the years; in disallowing a deduction of $2,656.25 for the fiscal year ended July 31, 1921, for an alleged loss

upon the cancellation of a lease on real estate; and in disallowing a deduction of $802.69 as an alleged loss upon abandonment of certain spur tracks.

These proceedings were previously consolidated by order for hearing and decision.

The petitioner is a Delaware corporation organized in July, 1919, to engage in selling and distributing casing, tubing and pipe throughout the oil country. It was organized by three individuals, Hoyle Jones, Joseph D. Holloway, and Leon W. Kile. Since its organization, Jones has been president and treasurer; Holloway, secretary; and Kile, vice president.

Prior to the organization of petitioner, Jones resided at Kansas City, Mo., where he was local sales manager for the La Belle Iron Works, which company was engaged in manufacturing and selling pipe of the kind sold and distributed by the petitioner. Except for a short period when he was in the Army, Jones had been engaged in selling pipe throughout the oil country for more than ten years. He was first connected with the Jacques Steel Co. Kile and Holloway had been connected previously with the Republic Iron & Steel Co. of Youngstown, Ohio, and the Wheeling Steel & Iron Co. of Wheeling, W. Va., respectively, and were also engaged in distributing and selling pipe throughout the oil country.

For many years Jones had contemplated the organization of a company to sell and distribute pipe for the leading manufacturers. Shortly after his return from the Army he conferred with Kile, who had by that time organized the Moore-Kile Co., which was engaged in distributing and selling pipe, and after discussing the matter at some length and studying the books of the Moore-Kile Co., tentative plans were made to include it in the new company to be organized.

Jones next conferred with Holloway, who was then in Chicago, and outlined his plan for the organization of petitioner. Holloway became interested and through his father, Jacob J. Holloway, who was chairman of the board of directors of the Wheeling Steel & Iron Co., Jones was introduced to a number of men in Wheeling who could provide capital for the new corporation. At a meeting held at the Fort Henry Club it was agreed to organize petitioner with paid-in capital of $300,000. Jones, Kile, and Joseph D. Holloway were to manage the business, while a group of Wheeling business men were ready to furnish the necessary capital. In accordance with the plans formulated at the above meeting, petitioner was organized and 3,000 shares of preferred stock were sold for cash at its par value of $100 per share. Common stock was distributed without payment therefor, one-half to Jones, Kile, and Joseph D. Holloway, and one-half to the purchasers of preferred stock. Of

the preferred stock, Jones, Kile, and Holloway subscribed for 300, 250, and 350 shares, respectively. After the organization was completed there were outstanding 3,000 shares of preferred stock and 3,000 shares of common stock.

Offices were opened by petitioner at Kansas City, St. Louis, Pittsburgh, Tulsa, and Wichita Falls. The Kansas City office was managed by Jones and from his office he arranged for the location of inventories of pipe at advantageous places in the oil fields, negotiated the contracts for the purchase of pipe, supervised the credit arrangements, and supervised in a general way the sales. Holloway was in the Pittsburgh office, where he maintained contact with the mills from which petitioner purchased its pipe, such contact being necessary to obtain prompt delivery of orders. He also supervised sales and distributions throughout the eastern territory. Kile managed the Tulsa office and was in direct supervision of the sales throughout Kansas, Oklahoma, Texas, Louisiana, and Arkansas, where petitioner did most of its business.

When petitioner was organized it was agreed that the three managing stockholders would be compensated in part by the issue of common stock and that fixed salaries of the three should be reasonably small. The salaries paid were as follows:

### 1920

| | |
|---|---:|
| Hoyle Jones, president and treasurer | $9,613.57 |
| J. D. Holloway, vice president and secretary | 9,613.57 |
| L. W. Kile, vice president | 5,967.74 |
| Daisie E. Hubbard | 1,792.50 |
| Total | 26,987.38 |

### 1921

| | |
|---|---:|
| Hoyle Jones, president and treasurer | $9,999.96 |
| J. D. Holloway, vice president and secretary | 9,999.96 |
| Daisie E. Hubbard, assistant secretary and treasurer | 3,150.00 |
| Total | 23,149.92 |

Aside from the officers, Jones, Kile, and Holloway, petitioner's organization and personnel included one or two stenographers in Kansas City, two salesmen and one stenographer in Tulsa, one traffic manager and a stenographer in St. Louis, and a salesman and stenographer in Wichita Falls, Tex., and a clerk or stenographer in Pittsburgh, Pa. The total salaries, excluding those paid to officers, amounted to $10,994.01 and $20,348.54, respectively.

On August 12, 1919, the petitioner entered into a contract with the Moore-Kile Co., by which the former acquired all the assets of the latter for $75,000, including two leases on real estate at Eastland and Cisco, Tex., valued at $5,000 and $10,000, respectively; real es-

tate at Wichita Falls, Tex., valued at $4,000; furniture, fixtures and other personal property valued at $2,100; and unshipped pipe orders, which the latter had placed with the mills but which would be delivered and paid for by petitioner at a future date, the *bonus* price of which was $25,238.

During the period immediately following the war, pipe was in great demand throughout the oil-producing territory. Selling was no problem, but it was almost impossible to procure deliveries from the mills. Because of the former connections of Jones, Kile, and Holloway, they were able to secure pipe when other companies could not do so. Although much of the pipe handled by petitioner was purchased outright, a substantial part of the total amount sold was furnished on a consignment basis by the La Belle Iron Works, for which company Jones had previously worked. Payment for such consigned pipe was made only after it had been sold. The following is a statement of petitioner's profits for the fiscal year ended July 31, 1920:

| | |
|---|---:|
| Total gross profit from sales | $338, 306. 02 |
| Total net profit from sales | 278, 550. 28 |
| Total sales of consigned goods | 184, 833. 19 |
| Total cost of consigned goods | 138, 103. 27 |
| Gross profit from sales of consigned goods | 46, 129. 92 |

The pipe acquired by petitioner on the unfilled orders purchased from the Moore-Kile Co., was sold at a profit of $101,116.08, which is computed as follows:

| | |
|---|---:|
| Total unshipped tonnage acquired from Moore-Kile Co _ _ _ _tons _ _ | 5,231 |
| Total sales of 5,231 tons | $705, 354. 08 |
| Total cost of 5,231 tons paid to manufacturers | 579, 387. 92 |
| Gross profit | 126, 354. 08 |
| Less contract price paid to Moore-Kile Co. for purchase of unfilled orders | 25, 238. 00 |
| Gross profit | 101, 116. 08 |

Early in 1921 conditions changed in the oil business. The supply of oil had greatly increased and drilling operations were reduced, which reduced the demand for pipe. Petitioner's business declined to such an extent that it closed several of its storage yards and abandoned facilities for handling pipe throughout Oklahoma and Texas.

Included in the assets acquired from the Moore-Kile Co. under the above contract were two leases, one known as the Eastland lease, and the other as the Cisco lease. Both leases were adjacent to the railroad and petitioner had bought spur connections. The Cisco lease cost petitioner $10,000. Amortization of $7,343.75 has been allowed previously by the respondent as deductions. In 1921 the lease

became worthless and the petitioner sustained a loss of $2,656.25. The Eastland lease cost petitioner $5,000. The respondent has allowed a deduction for the fiscal year ended July 31, 1921, for the unamortized cost. During the fiscal year ended July 31, 1921, the petitioner sustained a loss of $802.69, which represents the depreciated cost less salvage value of a spur track on the Eastland lease.

The respondent has computed the petitioner's income and invested capital as follows:

*Income for fiscal year ended July 31, 1920*

| | |
|---|---:|
| Net taxable income | $278,913.28 |
| Invested capital | 230,114.29 |
| Excess-profits tax | 98,078.91 |
| Total tax | 115,926.90 |
| Percentage of net income to invested capital_____per cent__ | 121 |
| Percentage of excess-profits tax to net income_____do____ | 35 |
| Percentage of total tax to net income_____do____ | 41.6 |

*Income for fiscal year ended July 31, 1921*

| | |
|---|---:|
| Gross sales | $1,529,689.36 |
| Net income | 86,162.09 |
| Invested capital | 417,648.58 |
| Excess-profits tax | 10,476.59 |
| Total tax | 17,400.63 |
| Percentage of net income to invested capital_____per cent__ | 21 |
| Percentage of excess-profits tax to net income_____do____ | 12.1 |
| Percentage of total tax to net income_____do____ | 20 |

We think the facts proved in these proceedings disclose abnormalities affecting petitioner's invested capital and income which entitle it to special assessment. Cf. *Rothschild Colortype Co.*, 14 B. T. A. 718; *Mesta Machine Co.*, 12 B. T. A. 523; *G. Angelo Co.*, 12 B. T. A. 460; and *Sol Frankel, Inc.*, 3 B. T. A. 494.

Reviewed by the Board.

*Further proceedings may be had under Rule 62 (c).*

MARQUETTE, SMITH, VAN FOSSAN, and MATTHEWS dissent.