CONTINENTAL PRODUCTS CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5057, 20050, 21842, 28733.   Promulgated September 15, 1930.

*William R. Brown, Esq.,* and *James D. Cooney, Esq.,* for the petitioner.

*Eugene Meacham, Esq.,* and *C. E. Lowery, Esq.,* for the respondent.

## OPINION.

LANSDON: These proceedings, which by order have been consolidated for hearing and decision, were instituted for a redetermination of deficiencies in income taxes for the calendar years 1918, 1919, and 1920 in the total amounts of $1,589,419.31, $871,498.62, and $24,222.88, respectively. The appeal in Docket No. 5057 is from the partial rejection of a claim in abatement covering an amount of $890,962.71 assessed for the year 1918, which was allowed to the extent of $23,317.66, and rejected as to the balance of $867,645.05. Docket No. 21842 also involves the year 1918, being an appeal from the additional deficiency asserted for that year of $721,774.26. The deficiency appealed from in Docket No. 20050, which pertains to the year 1919, represents the rejection of a claim in abatement covering $245,369.22 previously assessed against petitioner and the determination of an additional tax liability of $626,129.40. Docket No. 28733 is an appeal from a deficiency asserted for 1920 in the amount of $24,222.88. The petitioner has paid $300,000 taxes for 1918 under its tentative separate return filed March 15, 1919, which amount was made the subject of a claim for refund when later it joined in a consolidated return for that year.

Counsel for the parties have entered into and filed in the record a voluminous stipulation of facts which constitutes the only evidence offered in these proceedings and which we adopt as our findings of fact and incorporate herein by reference as a part of this report. This stipulation disposes of all questions of invested capital and income raised by the pleadings and leaves for determination by the Board the following issues:

(1) Whether the petitioner was affiliated during the taxable years with the Brazil Railway Co. and its subsidiaries;

(2) Whether the assessment or collection of taxes for each of the years is barred by the statute of limitations;

(3) Whether the assessment of $245,369.22 for the year 1919 under section 274 (d) of the Revenue Act of 1924 is invalid as being in violation of the due process clause of the Fifth Amendment to the Constitution of the United States; and

(4) Whether the petitioner is entitled to have its tax liability recomputed under the provisions of section 328 of the Revenue Act of 1918.

Pursuant to an order of the Board, the hearing was limited in the first instance to the issues other than special assessment as provided in subdivision (a) of Rule 62 of the Board's rules of practice.

Since the parties have stipulated that petitioner's net income for each of the years 1918 and 1919 was an amount less than that origi-

nally determined by the respondent, the additional deficiencies asserted for the respective years of $721,774.26 and $626,129.40 are eliminated and need not be considered further with respect to any of the issues.

The petitioner is a Maine corporation organized on December 23, 1912, for the purpose of engaging in the slaughter of cattle and other domestic livestock and the marketing of its products.

The Brazil Railway Co. is a Maine corporation organized on November 12, 1906, for the purpose of owning, developing and operating railways in the four temperate-zone states of Brazil. During the taxable years it owned or controlled substantially all the stock of the Sorocabana Railway Co., Uruguay Railway Co., Southern Brazil Lumber & Colonization Co., Brazil Development & Colonization Co., Sao Paulo Development & Colonization Co., and Brazil Land, Cattle & Packing Co., all of which were Maine corporations which it had organized as a part of its general scheme for building up traffic for the South American railroads which it operated.

The Brazil Land, Cattle & Packing Co., hereinafter sometimes referred to as the Cattle Co., owned approximately 7,000,000 acres of grazing land in southern Matto Grosso, together with some 150,000 head of cattle thereon. In 1911 there were no modern packing plants in Brazil where cattle could be slaughtered and the meat prepared for markets in Europe and the United States. On November 8, 1911, the Cattle Co. entered into a contract with architects and engineers in Chicago to provide plans and specifications for a packing plant to be located in Brazil, which would cost approximately $5,000,000. Having no person in its organization who was sufficiently experienced to superintend the construction and operation of a packing plant and develop markets for the finished products thereof, the Brazil Railway Co. and/or the Cattle Co. sought a competent manager in the United States. Failing to find a suitable individual, and ascertaining that the Sulzberger & Sons Co., which had an established organization for wholesale marketing of meats and other packinghouse products in Europe and the United States, would manage the construction and operation of the meat-packing plant to be built in Brazil for the Cattle Co., a contract was entered into on August 15, 1912, between the Cattle Co. and G. F. Sulzberger, who was the principal figure in the Sulzberger & Sons Co., which provides in part as follows:

\*     \*     \*     \*     \*     \*     \*

(1) A company (hereinafter referred to as the New Company) shall be formed under the laws of one of the United States whose principal object shall be to enter into the packing house and meat business, refrigerated and fresh, and the treatment of by-products, and all industries affiliated therewith or appurtenant thereto, in the Republic of Brazil.

(2) The parties hereto shall subscribe to the Capital of the New Company as follows: The Cattle Company shall subscribe to 77½% and the said Sulzberger to 22½% up to a total aggregate of £900,000 cash. The said Capital shall consist either of shares of stock subscribed for in cash at par or of shares of stock and bonds, as shall be subsequently determined by agreement between the parties. The parties shall pay their subscriptions in the proportions and amounts aforesaid, in whole or in part payments according to the financial requirements of the New Company.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(8) The said Sulzberger agrees to undertake for and on behalf of the New Company the entire conduct both of its operation and of the selling of its products and any and all by-products and of any and all operations in any way incidental or appurtenant thereto and agrees to furnish to the best of his ability such men and assistants as may be necessary to ensure the proper conduct of the New Company's businesses, and to send to Brazil, for account of and in the service of the New Company, such technical experts as may be necessary, it being understood that all the employees of the New Company shall have their salaries and such of their expenses as it may be found necessary paid by the New Company and that the said Sulzberger shall in no wise be individually called upon to participate in any such payment.

(9) It is a part of this Agreement that the said Sulzberger shall be given the absolute and final management and control of the affairs of the New Company in all matters of construction, operation and selling for a period of 20 (twenty) years starting from the time of the commencement of the first construction work which shall be undertaken for the New Company.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(11) In consideration of the services to be rendered to the New Company by the said Sulzberger hereunder the New Company shall pay to the said Sulzberger the sum of $60,000 (Sixty thousand dollars) per annum for a period of 10 years, commencing from the time of first construction above mentioned and thereafter the remuneration of the said Sulzberger shall be fixed by agreement between him and the Board of Directors of the New Company.

(12) The said Sulzberger shall have the right at any time before the 1st of January, 1917, to buy from the Cattle Company a further 22½% of any lesser interest in capital of the New Company, thus making a total holding of 45% by paying the cost price for such interest plus a 5½% interest charge thereon allowance being made for any dividends declared upon shares or interest paid upon bonds. It is understood that if the capital of the New Company shall consist of bonds and stock, the purchase of bonds at cost and interest as aforesaid shall include the shares of stock originally given as bonus with the said bonds.

(13) The parties mutually agree not to dispose of their respective holdings of stock of the New Company until the expiration of the 20 year period referred to in Clause (9) hereof.

(14) This agreement shall be assigned by the said Sulzberger to the Sulzberger & Sons Company or to some other corporation approved by the Cattle Company.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(16) It is expressly understood and agreed that if this agreement shall not be assigned before December 1st, 1912, to the Sulzberger & Sons Company, or if no other corporation to which this agreement should be assigned shall be approved by the Cattle Company this entire agreement shall be null and void and of no effect.

The petitioner was organized and its capital subscribed and paid for in accordance with the provisions above. In conformity with its terms the contract was assigned to the Sulzberger Products Co., a corporation organized by the Sulzberger & Sons Co. for the sole purpose of holding the contract with petitioner and the capital stock purchased pursuant to the contract.

Prior to January 1, 1917, the Sulzberger Products Co. exercised its option under the contract of 1912 to purchase 22½ per cent additional stock of the petitioner and after June 24, 1919, the petitioner's stock was owned 55 per cent by the Cattle Co. and 45 per cent by the Sulzberger Products Co.

On January 1, 1918, the petitioner entered into an agreement with the Sulzberger Products Co. and Wilson & Co., Inc., which was formerly Sulzberger & Sons Co., modifying the previous construction and management contract between the same parties. The material portions of such instrument are as follows:

\* \* \* The Sulzberger Company shall decide what policies shall be pursued in the operation of said business, the volume of business which the Products Company shall undertake from time to time to do, *the price which it shall pay for live stock and materials*, and, except as herein otherwise expressly provided, the prices at which its products shall be sold; \* \* \*.

\*        \*        \*        \*        \*        \*        \*

THIRD, The Sulzberger Company shall have power, in the name and on behalf of the Products Company, from time to time, to borrow such amounts of money as the Sulzberger Company shall deem necessary for the business of the Products Company, and, in the name and on behalf of the Products Company, to execute and deliver promissory notes or other writings evidencing such or any other indebtedness of the Products Company, \* \* \*.

\*        \*        \*        \*        \*        \*        \*

TENTH. The Products Company shall pay to the Sulzberger Company for the services herein agreed to be performed by it in the management of the business of the Products Company (in addition to any sums which may be payable to the S. & S. Co. or to any of its subsidiary or affiliated companies for services rendered under the provisions of Article Seventh hereof, or as commissions on sales of the products of the Products Company which shall be made by or through the selling organizations of the S. & S. Co. and its subsidiary and affiliated companies, respectively) the sum of Sixty thousand dollars ($60,000) per year from and after the date on which the construction of said packing-plant of the Products Company shall be begun and until January 1, 1918, and thereafter during the remainder of the term of this agreement the sum of Forty thousand dollars ($40,000) per year. Said compensation shall be payable annually.

\*        \*        \*        \*        \*        \*        \*

THIRTEENTH. The term of this agreement shall commence with the date hereof and shall end on December 31, 1929, *provided that either the Products Company or the Sulzberger Company shall, at least two years before that date, have given to the other notice of its desire that this agreement be terminated on that date,* and unless such notice shall be given the term of this agreement

shall continue from year to year beyond that date, and may be terminated on the 31st day of December in any year thereafter, by either the Sulzberger Company or the Products Company, by giving to the other at least two years' notice of its desire to terminate this agreement, which notice shall specify the date of termination, and in case any such notice shall be given the term of this agreement shall end on the 31st day of December specified in such notice. (Italics supplied.)

During the taxable years and prior thereto the Brazil Railway Co. and associated companies, including the Cattle Co. and petitioner, maintained United States offices at 25 Broad Street and/or 120 Liberty Street, New York City. Rodney D. Chipp and Theo C. Hall were in charge of the New York offices and managed all of the New York business for the various companies. Their salaries were paid by the Brazil Railway Co., and, together with rent and other office expenses, were prorated to the other companies in proportion to the work done for each. In the same years returns were filed and taxes thereon paid to the collector of internal revenue at Portsmouth, N. H.

The meetings of the petitioner's stockholders were all held in the Portland, Me., office of the Corporation Trust Co. Proxies were prepared prior to each meeting by Chipp and/or Hall in the New York offices which were signed for each and every meeting by the Sulzberger Products Co. and the petitioner. Minutes of the stockholders' meetings were prepared in advance by Chipp and Hall in the New York offices, with blanks for the officers' signatures, and were forwarded to the Corporation Trust Co., which held the meeting in accordance therewith. The only persons consulted with reference to what the minutes should contain were the attorneys of the Brazil Railway Co. Throughout the taxable years petitioner's stock was voted as a unit, proxies being executed each year as above stated.

During the years 1911 to 1920, inclusive, the Brazil Railway Co. and associated companies, including the Cattle Co. and petitioner, had interlocking directorates and officers. Thomas E. Wilson was the only officer of petitioner who was an officer or director of the Sulzberger Products Co.

The petitioner contends that it was affiliated with the Brazil Railway Co. group for Federal tax purposes in the years 1918, 1919, and 1920. Section 240 (b) of the Revenue Act of 1918 provides:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others. * * *

Throughout the taxable year 1918, and until June 24, 1919, the Cattle Co. owned 77½ per cent of the petitioner's outstanding capital stock. From June 24, 1919, until the end of the taxable year 1920, it owned 55 per cent of such stock. The remainder, amounting to

22½ per cent and 45 per cent, respectively, was owned by the Sulzberger Products Co. The petitioner does not seriously contend that such percentages constitute " substantially all " within the meaning of the Act and the decisions are clear that in the absence of control of additional stock they do not. *D. S. Brandon*, 10 B. T. A. 1118; *Empire Safe Deposit Co.*, 19 B. T. A. 1137. The petitioner alleges, however, that the Sulzberger Products Co., being the manager of petitioner, is a " closely affiliated interest " and, therefore, under the decisions of this Board 100 per cent of its capital stock was owned or controlled through closely affiliated interests. It is also contended that stock of the minority interest was controlled by " a nominee or nominees."

The question of affiliation has been before the Board and the courts on numerous occasions, and though there has been some difference of judicial opinion as to the percentage of ownership or control necessary to constitute a basis of affiliation under the various applicable statutes, it is well settled that the minority or divergent interest must be so small as to be practically negligible. *Ice Service Co.* v. *Commissioner* (2d Cir.), 30 Fed. (2d) 230; *Great Lakes Hotel Co.* v. *Commissioner* (7th Cir.), 30 Fed. (2d) 1. There is also a difference of opinion as to what is meant by " control " of the stock by the same or closely affiliated interests under the statute. The Second Circuit has declared the test to be a substantial identity of interest and not control of the business or policies of the subsidiaries. It has held that the ownership or control of stock required by the statute refers to the beneficial interest and that the benefit of consolidated returns extends to those subject to the hazard of a single enterprise, though carried on through the instrumentalities of several corporations. *Ice Service Co.* v. *Commissioner*, *supra; Commissioner* v. *Hirsch & Co.*, 30 Fed. (2d) 645; and *Goldstein Bros. Amusement Co.* v. *White*, 33 Fed. (2d) 787. The Seventh Circuit, in *Great Lakes Hotel Co.* v. *Commissioner*, *supra*, holds to a more liberal interpretation of the statute. It defines " substantially all the stock " as equivalent to " a large majority " and holds to be " closely affiliated interests " those stockholders who " were guided in their action by a common interest and the common object was attained by all corporations pursuing the same methods through the same agencies." Only the divergent or conflicting interests are considered as constituting minority stockholdings.

We have declared our views on affiliation in numerous cases and have adopted a theory substantially the same as that declared by the Second Circuit. *Empire Safe Deposit Co. supra; Conley Tin Foil Corporation*, 17 B. T. A. 65. See also *American Auto Trim-*

*ming Co.* v. *Lucas,* 37 Fed. (2d) 801; *News Publishing Co.* v. *Blair,* 29 Fed. (2d) 955; *Alameda Investment Co.* v. *McLaughlin* (D. C.), 28 Fed. (2d) 81; affd. (9th Cir.), 33 Fed. (2d) 120.

In its brief, the petitioner cites many of our decisions in support of the proposition that the minority stockholder employed by contract as its manager was a " closely affiliated interest." We do not think the decisions cited support such a proposition. In *Gamon Meter Co.,* 1 B. T. A. 1124, we granted affiliation and held that where a manager received 20 per cent of the stock without cost under an agreement reserving control to the majority that he represented a " closely affiliated interest." The stock there was given to provide for additional compensation through dividends. In *Eimer & Amend,* 2 B. T. A. 603, stock was issued to an expert glass grinder in order to obtain his services under a contract providing that if he should leave the employment the stock was to be returned without cost. We held that he was a " closely affiliated interest " and allowed affiliation. The theory supporting those and similar decisions is expressed in *Isse Koch & Co.,* 1 B. T. A. 624. We there said that an employee might refuse to vote his stock in accordance with the desire of the majority, but he would thereby render himself liable to the loss of his employment and the surrender of his stock. We held, therefore, that the majority controlled such stock and that the corporations were affiliated. In each of the cases cited by the petitioner there have been facts indicating control by the majority of the employees' stock. *Hagerstown Shoe & Legging Co.,* 1 B. T. A. 666; *Schloss Brothers Co.,* 1 B. T. A. 581; *Stauffer Chemical Co.,* 2 B. T. A. 841; *Lee S. Smith & Sons Co.,* 3 B. T. A. 343.

In *Ullman Manufacturing Co.* v. *United States,* 67 Ct. Cls. 104, 20 per cent of the outstanding stock was owned by a salesman. The court held that 100 per cent of the stock was owned or controlled through " closely affiliated interests," saying: " Fishel was a salaried employee and could have been peremptorily discharged at any time. He could not sell his stock except to plaintiff company." But in *Wadhams & Co.* v. *United States,* 67 Ct. Cls. 235, where an employee was given 20 per cent of the stock as consideration for service rendered, the court denied affiliation on the ground that he was not a " closely affiliated interest " and his stock was not controlled by the majority.

We think the facts of the instant case are different from those discussed above and upon which the petitioner relies. Here the management contract between petitioner and the Sulzberger Products Co. provides that the latter shall not sell its interest for 20 years; that it shall have complete control as to all questions of management; that it shall fix the price to be paid for livestock; and that it

shall be manager for 20 years, receiving $60,000 per annum. The Sulzberger Products Co. was engaged as manager by contract and could not have been discharged peremptorily. The power to fix prices to be paid for livestock and for the sale of finished products protected the Sulzberger interests against any arbitrary diversion of income from petitioner to the Cattle Co.

It is true that each year the Sulzberger Products Co. executed proxies to officers of the Cattle Co. and/or the Brazil Railway Co. This, however, is not the control required by the statute. *Tunnel Railroad of St. Louis et al.*, 4 B. T. A. 596; *Central Auto Equipment Co.*, 7 B. T. A. 1068; *Empire Safe Deposit Co., supra; News Publishing Co.* v. *Blair, supra.* The Sulzberger Co. might, at any time, have asserted its right to vote its stock and it could not have been prevented from so doing. As stated in *Tunnel Railroad of St. Louis, supra,* "the right of a proxy is not a relinquishment by the donor of any of the rights of ownership or control."

Except for the rather small difference in the amount of petitioner's stock owned, it might just as forcefully be argued that the petitioner was affiliated with the Sulzberger group of corporations, and most certainly the petitioner would not contend that the Brazil Railway Co. and Sulzberger & Sons Co. are "closely affiliated interests." We think the following discussion from the opionion of the District Court for the Northern District of Montana in *Montana Mercantile Co.* v. *Rasmussen,* 28 Fed. (2d) 916, which case was cited with approval by the Circuit Court in *Commissioner* v. *Hirsch & Co., supra,* and *Ice Service Co.* v. *Commissioner, supra,* is particularly applicable in the instant case.

In brief, the benefits of the statutes extend to those subject to the hazards of the enterprise, and only when they are substantially one and the same.

This is not the present case. If Montana lost a million, and Western gained a million, it would be unjust to acquit the 50 per cent Western shareholders, without interest in Montana, of taxes on Western profits, because of Montana losses, which fall not upon them. Yet that is the principle for which plaintiffs contend. It has no basis in the statutes.

In the instant case, the 22½ to 45 per cent interest of the Sulzberger Products Co. in petitioner should not be acquitted of taxes on petitioner's profits because of the Brazil Railway group losses, when the Sulzberger Co. represents an outside interest which is not entitled to have its share of the profits offset against losses incurred by a corporation or corporations in which it has no interest. We think affiliation should be denied.

The facts of this proceeding distinguish it from the recent decisions of the Circuit Court of Appeals for the First Circuit in *Commissioner* v. *Crescent Leather Co.,* 40 Fed. (2d) 833, and *Kile &*

*Morgan Co.* v. *Commissioner*, 41 Fed. (2d) 925. In the former case the facts disclosed that "the Crescent Leather Company, through its president and treasurer, controlled by ownership, contract and otherwise all the voting stock of the Buckman Tanning Company." The court affirmed the Board's decision, 13 B. T. A. 940, which allowed affiliation. The *Kile* case arose under the Revenue Act of 1924 and the question presented was whether at least 95 per cent of the voting stock of two concerns was owned by the same interests. The court reversed the Board and held that the minority interest was negligible.

The second issue to be determined in these proceedings is whether assessment and/or collection of the deficiencies appealed from is barred by the statute of limitations. The petitioner filed a tentative separate income and profits-tax return for the calendar year 1918 on March 15, 1919. The return disclosed an estimated tax of $300,-000, which amount was paid in installments of $100,000 on March 15, June 15, and September 15, 1919. On November 15, 1919, a completed and final consolidated return was filed by the Brazil Railway Co. for itself and its subsidiaries, including petitioner. This return was accompanied by a claim for refund of the $300,000 theretofore paid. Upon audit of the return the Commissioner held that the companies were not affiliated, denied the claim for refund, and on March 10, 1924, assessed a deficiency of $890,962.71, which had been previously determined on January 21, 1924. A duplicate claim for refund covering the $300,000 payment was filed on February 29, 1924. On March 29, 1924, the petitioner executed and filed a claim for abatement of the assessment of $890,962.71, which was received and considered by the respondent. Thereafter, on June 4, 1924, the petitioner filed a "waiver" extending the period of limitations for one year. The respondent made a final determination of petitioner's abatement claim on April 25, 1925, allowing the same in the amount of $23,317.66, and denying it as to the balance of $867,645.05. Appeal to the Board was filed on June 22, 1925, which was assigned Docket No. 5057.

The recent decision of the Supreme Court in *Florsheim Brothers Drygoods Co.* v. *United States*, 280 U. S. 453, disposes of petitioner's contention that the period of limitation started running with the filing of a tentative return. The court held that the statute started running when the so-called "completed return" was filed. As to the taxes due for 1918, the respondent had five years from the day the final return was filed within which to make assessment and collection. Section 277 (a) (2) of the Revenue Act of 1924. This period would have expired on November 15, 1924, except for the waiver executed on June 4, 1924, which extended the period to November 15, 1925.

The final determination by the respondent and appeal to this Board occurred before that date. Collection is not barred by the statute of limitations.

On March 15, 1920, the same group of corporations filed a tentative consolidated income and profits-tax return for the calendar year 1919. A completed and final return was filed on March 3, 1921, showing no tax liability for the consolidated group. On August 9, 1924, the respondent determined that petitioner was not affiliated with the Brazil Railway group of corporations and asserted a deficiency of $245,369.22. The petitioner protested such determination and was granted a hearing before the Bureau of Internal Revenue. In February, 1925, upon petitioner's failure to execute a waiver of the statute of limitations the respondent made a so-called " jeopardy assessment " of the above amount. Thereafter, the petitioner filed a claim in abatement which was finally rejected on July 22, 1926. Section 278 (d) of the Revenue Act of 1924 extended the period within which the tax could be collected to six years after the assessment was made. Collection of the tax is not barred.

The petitioner contends that the tax was not in jeopardy within the meaning of section 274 (d) of the Revenue Act of 1924, and that such section is unconstitutional. In a proceeding before the Board upon a claim in abatement resulting from a jeopardy assessment, the Board is without power to adjudicate whether the circumstances upon which the Commissioner acted were such as to denote that the assessment or collection of the deficiency would be jeopardized by delay. *California Associated Raisin Co.*, 1 B. T. A. 1251; *Clois L. Greene*, 2 B. T. A. 148; *James Couzens*, 11 B. T. A. 1040; and *Henry Veeder*, 10 B. T. A. 884. In affirming the latter decision, *Veeder* v. *Commissioner*, 36 Fed. (2d) 342, the court stated:

While the question is not free from doubt, we are of the opinion that the review before the Board of Tax Appeals under section 279 (b), Act of 1924 (26 USCA § 1063, note), which review is upon the Commissioner's ruling upon the claim of abatement, brings before the Board the merits of the question of the taxpayer's liability, and the amount thereof. While there are important differences between the procedure under section 274 (a) and (b) (26 USCA §§ 1048, note, 1049, note), on the one hand, and section 274 (d) (26 USCA § 1051, note,) on the other, such differences are matters of procedure not affecting the amount or justice of the tax which the taxpayer will ultimately be required to pay. Whether the Commissioner should proceed under (a) and (b) of section 274, or under (d) thereof, is an administrative question not affecting the amount of the tax. There is also the absence of statutory standards by which any reviewing body may test the correctness of the belief of the Commissioner. These two elements quite clearly distinguish the instant case from that of *Blair* v. *Oasterlein Machine Co.*, 275 U. S. 220, 48 S. Ot. 87, 72 L. Ed. 249. The provisions of section 274 (d), permitting the Commissioner

to make jeopardy assessments pending appeal from his determination of a deficiency, seems inconsistent with congressional intent that the Board should, on review of a claim in abatement of such an assessment, inquire into the reasons prompting the Commissioner to thus proceed.

Section 274 (d) of the Revenue Act of 1924 provides for the so-called "jeopardy assessment" and for collection by distraint, which petitioner alleges is in violation of the Fifth Amendment to the Constitution. Similar constitutional questions involving the assessment and collection of taxes by summary proceedings have been before the courts on numerous occasions and the statutes authorizing such action by the administrative officer have uniformly been upheld. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 59 U. S. 272; *Routzahn* v. *Tyroler*, 36 Fed. (2d) 208; *Phillips* v. *Commissioner*, 42 Fed. (2d) 177; *Springer* v. *United States*, 102 U. S. 586. See also *Bailey* v. *George*, 259 U. S. 16. Section 274 (d) has been before the courts several times, and we find no decision holding that it is invalid. We think the tax should be collected.

For the taxable year 1920 the Brazil Co. and its subsidiaries filed a tentative consolidated income and profits-tax return on March 9, 1921. On March 28, 1927, the respondent asserted a deficiency of $24,222.88, and this appeal was filed on May 23, 1927. The petitioner does not allege, nor do the facts disclose, when a completed return was filed. In such circumstances we must hold that assessment and collection are not barred. *Mary G. Iba et al.*, 20 B. T. A. 222.

Reviewed by the Board.

*Further proceedings may be had under Rule 62 (b) and (c).*