CONTINENTAL PRODUCTS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5057, 20050, 21842, 28733. Promulgated September 23, 1931.

*W. R. Brown, Esq.*, for the petitioner.
*Eugene Meacham, Esq.*, and *C. E. Lowery, Esq.*, for the respondent.

OPINION.

LANSDON: These are proceedings under Rule 62 (b) of the Board's rules of practice. The hearing in the first instance, which was had

on January 21, 1930, was limited by order of the Board to the issues other than special assessment. A decision was rendered disposing of such issues (20 B. T. A. 818) on March 24, 1930, and leave was granted for further proceedings under Rule 62 (b) and (c).

The principal facts, which are contained in a voluminous stipulation filed at the former hearing, are stated in our earlier report and need not be repeated here. At the hearing on March 26, 1931, which was limited to the issues stated in subdivision (b) of Rule 62, the parties filed a "second agreed statement of facts," which we shall summarize because of its length, but which is incorporated by reference as a part of this report.

The petitioner was incorporated to construct and operate a meat-packing plant in Brazil, under a management contract dated January 4, 1913, between the petitioner, the Sulzberger Products Company, and Sulzberger & Sons Company. Land for use as a plant site was conveyed to petitioner by its majority stockholder for a consideration of Rs. 135,406$921 (approximately $43,600). The plans prepared for the plant disclosed an estimated cost of $5,000,000. Sulzberger & Sons Company, through its purchasing department, which was made available to petitioner, aided the latter in purchasing material for construction at the lowest prices. No charge was made to the petitioner for such services of Sulzberger & Sons Company and no payment was made by the petitioner for such services. Neither was there capital stock issued therefor. The plant erected for petitioner cost $1,153,784.98.

During the taxable years 1918, 1919 and 1920 the greater part of the meats and other products of the petitioner's packing plant were sold by Archer & Company, Limited, a subsidiary of Sulzberger & Sons Company. The sales were made largely through stalls leased by Archer & Company, Limited, in the Smithfield Market in London. Such leaseholds had a reasonable market value of $150,000 over and above the rent payable. The petitioner paid no rent or charge for the use of the stalls other than the commissions fixed by contract dated January 4, 1913.

Prior to January 1, 1918, the Brazil Railway Company and/or the Sorocabana Railway Company, which were affiliated with the Brazil Land, Cattle & Packing Company, transported materials for construction of the packing plant without any freight charge, and transported other materials for construction of the plant at less than the usual or customary freight rate.

The Sorocabana Railway Company owned and operated a narrow gauge railway, with tracks one meter wide, from the Sao Paulo to the petitioner's packing plant. Prior to January 1, 1918, it constructed a third rail from Sao Paulo to the petitioner's plant, so as

to transport cars running on tracks one and six-tenths meters in width. Such third rail served no other industry and was solely for the benefit of the petitioner. No charge was made to petitioner for the construction or use of said third rail other than the freight charges as shown in paragraph 8 of the stipulation.

Prior to January 1, 1918, and without cost to the petitioner, the Brazil Railway Company surveyed the land for the construction of petitioner's plant, arranged for railroad tracks to serve it, excavated and filled the site, built viaducts and constructed a substantial railway station at the petitioner's plant for the sole accommodation of the petitioner and its employees. Trains were operated between Sao Paulo and petitioner's plant, transporting petitioner's employees at nominal fares.

Prior to and throughout the taxable years 1918, 1919 and 1920, the Brazil Railway Company furnished the petitioner with land adjacent to its packing plant upon which the petitioner erected a pumping station and laid pipe lines and sewers. No charge was made to the petitioner for the use and occupancy of the land.

Receivers were appointed for the Brazil Railway Company and the Brazil Land, Cattle and Packing Company in the latter part of 1914. Thereafter it was impossible for petitioner to secure additional capital from its stockholders as provided for in the contract of August 15, 1912, which is quoted in our former report (20 B. T. A. 818). As a result of its inability to secure additional capital, petitioner did not have sufficient money with which to conduct its business and finance the sale of its products in the European and United States markets. Arrangements were therefore made with bankers in the United States and London whereby drafts were drawn for approximately 70 per cent of the market value of shipments. The drafts, together with all shipping documents endorsed in blank, were then delivered to the bankers' South American correspondent and petitioner received cash for the face of the drafts. The correspondent forwarded the drafts and shipping documents to the bankers, who delivered the shipping documents and/or the goods to Wilson & Company, and/or Archer & Company, Limited, selling agents for the petitioner, upon receiving a trust receipt from such concerns which provided that the goods and/or the proceeds would be held in trust by Wilson & Company and/or Archer & Company, Limited, as the property of the said bankers until the draft was paid. As and when the goods were sold the proceeds were paid to the bankers until the drafts and all interest and other bank charges were paid. The balance of the proceeds of the goods, if any, after payment of storage, insurance, handling charges, and commissions, was remitted to the petitioner in South America. During 1918, peti-

tioner's total sales were $10,398,919.11, its export shipments $7,917,430, and drafts drawn against such export shipments $4,324,223. During 1919 total sales were $13,933,473.97, export shipments $9,114,525.43, and drafts drawn against such export shipments $5,727,663.83. While the drafts drawn by petitioner against shipments approximated 41 per cent of total sales, other packing companies used this method of finance only to the extent of from 5 to 10 per cent of total sales. During 1918 and 1919 petitioner's total indebtedness was as follows:

| Date | Accounts payable | Notes payable and other indebtedness | Drafts against export shipments |
|------|------|------|------|
| Dec. 31, 1917 | $418,445.00 | | $1,125,775.00 |
| Mar. 31, 1918 | 119,928.65 | $200,000.00 | 1,324,364.36 |
| June 30, 1918 | 90,819.69 | | 1,861,167.29 |
| Sept. 30, 1918 | 233,592.46 | | 1,644,961.95 |
| Dec. 31, 1918 | 428,696.00 | 288,543.00 | 1,566,395.70 |
| Mar. 31, 1919 | 91,680.66 | | 1,622,088.70 |
| June 30, 1919 | 270,048.52 | | 1,819,139.46 |
| Sept. 30, 1919 | 447,512.21 | 100,000.00 | 2,718,182.69 |
| Dec. 31, 1919 | 184,388.00 | { 349,763.00 / 170,802.00 / 650,000.00 } | } 3,348,013.39 |

The Sorocabana Railway Company established a special rate for the transportation of meats and packing-house products from petitioner's packing plant at Osasco to the petitioner's branch house or wholesale market in Sao Paulo. From January 1, 1918, to March, 1919, such rate was Rs. 14$400 (approximately $3.81) per car; from March, 1919, to February, 1920, the rate was Rs. 12$600 (approximately $3.28) per car. In February, 1920, the government took over the Sorocabana Railway and advised the petitioner that it would thereafter have to pay the regular rate of Rs. 22$500 (approximately $5.75) per car. The petitioner was advised by traffic managers of other railroads and legal authorities that the rate of Rs. 22$500 was fair and reasonable and that the previous rate had been preferential and was procured only because the Sorocabana Railway was interested in the petitioner's business. The number of cars transported from the petitioner's packing plant to its branch house in Sao Paulo varied from 63 to 143 per month, with an average of about 95 per month.

The Sorocabana Railway Company entered into a traffic agreement with the Mogyana Railway Company for the transportation of cattle from Compinas to the petitioner's packing plant. This agreement was in effect throughout 1918 and 1919 and provided preferential rates for shipment of cattle to the petitioner's packing plant. This agreement was canceled when the government took over the operation of the Sorocabana Railway in February, 1920.

The respondent has made no allowance to petitioner for invested capital purposes on account of any of the above advantageous benefits.

The petitioner's income, invested capital, and taxes for the years involved have been computed by the respondent in the following amounts:

|  | 1918 | 1919 |
|---|---|---|
| Net income | $994,533.98 | $664,803.89 |
| Invested capital | 2,562,551.26 | 2,834,626.13 |
| Excess-profits tax | 588,223.08 | 106,552.48 |
| Total tax | 636,740.39 | 162,204.32 |
| Tax percentage of income | 64.02 | 24.40 |

Section 327 (d) of the Revenue Act of 1918, under which petitioner's claim for special assessment arises, provides:

Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328.

The single question now before the Board is whether or not there were abnormal conditions affecting petitioner's capital or income for the period here involved which would entitle it to the benefits of section 328 of the Revenue Act of 1918. The petitioner contends that there were numerous such abnormal conditions affecting its capital or income as follows: (1) That petitioner's minority stockholder, Sulzberger & Sons Company, rendered valuable services in connection with the construction of petitioner's plant without receiving compensation therefor; (2) that petitioner's products were sold in London by Archer & Company, Limited, a subsidiary of Sulzberger & Sons Company, through valuable stalls in the Smithfield Market without any payment by petitioner for the use of such stalls; (3) that companies affiliated with petitioner's majority stockholder transported materials for the construction of petitioner's packing plant without any freight charge or at less than the customary rate; (4) that the Sorocabana Railway Company, which was affiliated with petitioner's majority stockholder, constructed a third rail from Sao Paulo to petitioner's plant without any charge to petitioner other than for freight carried; (5) that the Brazil Railway Company surveyed the land on which petitioner's plant was to be built, constructed railroad tracks, built viaducts, excavated and filled the plant site, furnished land upon which petitioner erected a pumping station, pipe lines and sewers, and rendered various other

services for which it received no compensation other than charges for freight carried; (6) that because of insufficient working capital, petitioner was compelled to borrow money on the credit of its minority stockholder by drawing drafts against shipments of merchandise; and (7) that petitioner received preferential freight rates from companies affiliated with its majority stockholder.

In support of its claim for special assessment the petitioner cites *Viscose Co.*, 3 B. T. A. 444; *National Casket Co.*, 3 B. T. A. 954; *D. N. & E. Walter & Co.*, 4 B. T. A. 142; *J. M. & M. S. Browning Co.*, 6 B. T. A. 914; *Clarence Whitman & Sons, Inc.*, 11 B. T. A. 1192; *Mesta Machine Co.*, 12 B. T. A. 523; *Rothschild Colortype Co.*, 14 B. T. A. 718; *Farnsworth, Hoyt Co.*, 16 B. T. A. 309; *William Wilson Co.*, 18 B. T. A. 1107; *Woodbury Shoe Co.*, 19 B. T. A. 433; and *Superior Tube Co.*, 20 B. T. A. 749. The facts of the instant proceeding do not bring the petitioner within the rule established in the above cases. Here the petitioner has not received property which should be taken into invested capital, for the facilities used by it without charge or at nominal cost belonged to other corporations and never became its property. Nothing in the record indicates that petitioner has been denied credit in invested capital for the total capital actually at risk in its business. The stalls in Smithfield Market were not used directly by petitioner and were at no time its property. Sales of petitioner's products through such stalls were made by Archer & Company, Limited, which concern received customary commissions on sales for petitioner. The third rail constructed by the Sorocabana Railway Company from petitioner's plant to Sao Paulo represented an investment by that company and was, at all times, a part of its capital rather than petitioner's. It received a return on its investment by charging petitioner for freight hauled.

While the services rendered to petitioner without charge or at nominal charges, set forth as contentions (1), (3), (5) and (7), may have affected petitioner's income, we are of the opinion that no such abnormality has been established as contemplated by the statute. There can be no doubt that because of such advantageous arrangements and fortunate conditions petitioner's income was greatly increased, but we do not understand that Congress intended to favor corporations merely because they were able to earn a large income, even though it resulted partly from their favorable connections with another corporation. In our former report we quoted at length from a management contract by which petitioner engaged G. F. Sulzberger to manage the construction and operation of its plant in consideration of payment to him of $60,000 per annum. In accordance with its terms the contract was assigned to Sulzberger Products Company, the stock of which was owned by Sulzberger & Sons Com-

pany. While the parties have stipulated that no charges were made and there was no payment for the services contributed to petitioner by the Sulzberger Companies, we are inclined to the opinion that such services were contemplated by the $60,000 annual management fee and that indirectly petitioner did pay for the services rendered to it.

The preferential freight rates granted to petitioner by its majority stockholder and corporations affiliated with such stockholder were, of course, beneficial to petitioner and doubtless increased its net income. We think it is a fair presumption, however, that such an arrangement was also beneficial to the railway companies, since their chief object in organizing petitioner was to build up traffic for their lines (20 B. T. A. 818) and that such rates were granted in an effort to stimulate the raising of cattle at points distant from petitioner's plant, which would mean increased revenue for the railroad company. Certainly we do not think such favorable conditions are grounds upon which petitioner may get its tax reduced by securing special assessment.

There is nothing more usual in the export business than the drawing of drafts against shipments of merchandise. A concern doing an export business requires less capital than one which sells its products in a domestic market extending credit to its customers for from 30 to 90 days as is the custom in the United States. We, therefore, give little weight to the testimony that petitioner borrowed money by drawing sight drafts against shipments in an amount from four to eight times larger than other meat-packing companies and that because of such fact petitioner's capital was abnormally low and its borrowings abnormally high. Because petitioner was located in South America, and was, therefore, largely doing an export business, its normal capital requirements were lower than other meat-packing companies.

We can not agree with petitioner that the drawing of drafts in the manner outlined above constituted the borrowing of money on the credit of petitioner's minority stockholder. The latter was, in each instance, the consignee of petitioner's products, to act as agent in selling the same. Acceptance by the consignee of a draft drawn by the petitioner is in the nature of an advance on the merchandise rather than a borrowing of money on the credit of the consignee. The acceptance of a draft by the drawee makes him primarily liable and he does not guarantee payment of another's obligations.

We think the respondent correctly denied petitioner's application for special assessment.

*Decision will be entered under Rule 50.*